| | | |
|---|---|---|
| **OSCAR TRAPAGA, JOSE LOPEZ and MARK VASQUEZ,** | ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **No. 05 C 5742** |
| **CENTRAL STATES JOINT BOARD LOCAL 10,** | ) ) ) | **Judge Rebecca R. Pallmeyer** |
| **Defendant.** | ) ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiffs Oscar Trapaga, Jose Lopez, and Mark Vasquez, former employees of Edsal Manufacturing Company ("Edsal"), bring this action against Defendant Central States Joint Board Local 10 ("Local 10"), the union representing Plaintiffs when they were terminated for disrupting the workplace by collecting signatures on organizing petitions for a rival union. Local 10 filed grievances on behalf of Plaintiffs, contending that Edsal discharged Plaintiffs without just cause, and processed those grievances through binding arbitration, where the discharges were upheld. Plaintiffs, who are of Mexican origin, claim that Local 10 intentionally discriminated against Plaintiffs on the basis of their national origin, in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, and 42 U.S.C. § 1981, by failing to present, at the arbitration hearing, evidence that Edsal treated native-born employees more favorably. Local 10 has moved for summary judgment on Plaintiffs' claims, and for the reasons set forth below, Local 10's motion is granted.

## FACTUAL BACKGROUND[1]

### I.    Defendant's Evidentiary Challenges

Plaintiffs, responding to Defendant's motion for summary judgment, attach ten affidavits to their Local Rule ("LR") 56.1 materials. Defendant challenges the admissibility of those affidavits

---

[1]    The facts presented here are drawn from the parties' Local Rule 56.1 statements and attachments. Defendant's Corrected Rule 56.1 Statement of Material Facts as to Which There Is No Genuine Issue is cited here as "Def.'s 56.1." Plaintiffs' Response to Defendant's Local Rule 56.1(b)(3)(B) Statement of Facts and Plaintiffs [sic] Local Rule 56.1(b)(3)(C) Statement of Additional Facts is cited as "Pl.'s 56.1." Defendant's Response to Plaintiffs' Local Rule 56.1 Additional Facts is cited as "Def.'s 56.1 Resp."

on a number a grounds, and moves to strike the affidavits in whole or in part. (Defendant's Motion to Strike Affidavit in Whole or in Part (Def.'s Aff. Mem.").) In addition, Defendant moves to strike the portions of Plaintiffs' LR 56.1 response and statement of additional facts that rely on those affidavits for evidentiary support, and further moves to strike Plaintiffs' LR 56.1 materials for failure to comply with LR 56.1. (Defendant's Motion to Strike Plaintiffs' Response to Defendant's Local Rule 56.1(a)(3) Statement of Facts and Plaintiffs' Additional Facts ("Def.'s 56.1 Mem.").) Because these affidavits constitute nearly the whole of Plaintiffs' evidentiary response in this matter,[2] the court, as a preliminary matter, addresses Defendant's motions.

### A.    Motion to Strike Affidavits

In response to Defendant's motion for summary judgment, Plaintiffs submit the affidavits of Plaintiffs Trapaga, Lopez, and Vasquez, as well as those of Ernesto Garduno, Matiana Garduno, Alicia Cisneros, Jose Orozsco, Luz Maria Gonzales, Angel Castillo and Jorge Hernandez. Defendant contends that under Rule 56(e) of the Federal Rules of Civil Procedure, the court cannot properly consider these affidavits because (1) none of the affidavits is properly sworn to or verified, (2) several lack proper authentication of testimony translated from Spanish, and (3) all contain testimony that is speculative, conclusory, or that relates to matters not within the affiants' personal knowledge. The court here addresses only the first two arguments, both of which challenge the form of the affidavits themselves, and defers discussion of their substantive content.

---

[2]    Plaintiffs also submit a transcript of the deposition testimony of Jose Trevino, which Plaintiffs in their LR 56.1 materials cite to less frequently than the affidavits. (Trevino Dep., Ex. 4 to Pl.'s 56.1.) In addition, several of the affidavits attached as exhibits are followed, without identification or explanation, by affidavits subscribed before the NLRB approximately three years prior to the dates of the challenged affidavits. Plaintiffs cite infrequently to these materials as well.
    The court cites the NLRB affidavits as "NLRB [affiant] Aff. ¶ __". Defendant does not challenge the sufficiency of the NLRB affidavits, nor does the record reveal what proceeding, if any, took place before the NLRB.

## 1. Verification

Defendant contends that all of the affidavits must be stricken as either improperly sworn to or verified. (Def.'s Aff. Mem., at 3-14.) Although Rule 56(e) permits the use of affidavits in support of or opposition to a motion for summary judgment, *see* FED. R. CIV. P. 56(e), an affidavit is admissible in a summary judgment proceeding only if it is sworn to before an officer authorized to administer an oath, such as a notary public. *See Pfeil v. Rogers*, 757 F.2d 850, 859 (7th Cir. 1985). Under 28 U.S.C. § 1746, however, an unsworn declaration which is dated and signed by the declarant "under penalty of perjury" and verified as "true and correct" may be used, in lieu of a sworn affidavit, to support or respond to a motion for summary judgment.[3] *DeBruyne v. Equitable Life Assur. Soc'y*, 920 F.2d 457, 471 (7th Cir. 1990); *Davis v. Frapolly*, 756 F. Supp. 1065, 1067 (N.D. Ill. 1991). An unsworn declaration may substitute for an affidavit only if it subjects the

---

[3]     28 U.S.C. § 1746 provides as follows:

§ 1746. Unsworn declarations under penalty of perjury

Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:

* * * * * *

(2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).

(Signature)".

declarant to penalties of perjury. *DeBruyne*, 920 F.2d at 471.

None of Plaintiffs' affidavits was sworn to before a notary; therefore, each constitutes an unsworn declaration that can be admissible only pursuant to 28 U.S.C. § 1746.[4]  To this end, nine of the ten affidavits contain a "Verification" statement with date and signature.  None, however, uses the statutory language "under penalty of perjury" in attesting to the truth of the statements therein. The affidavits of Plaintiffs Lopez and Vasquez state: "I, [declarant], swear on my oath and under penalty of the law requires [sic] everyone to tell the turth [sic] that my above statements are true." (Lopez Aff., Ex. 2 to Pl.'s 56.1; Vasquez Aff., Ex. 3 to Pl.'s 56.1.)  Similarly, Ernesto Garduno and Matiana Garduno in their affidavits "swear on my oath and under penalty of the law for telling the truth that the above statements are true."  (E. Garduno Aff. ¶ 3, Ex. 5 to Pl.'s 56.1; M. Garduno Aff. ¶ 4, Ex. 6 to Pl.'s 56.1.)  The affidavits of Cisneros, Orozsco, Gonzales, and Castillo contain pithier language: "I, [declarant], swear on my oath and under penalt[y][ies] of the law that my statements above are true."  (Cisneros Aff., Ex. 7 to Pl.'s 56.1; Orozsco Aff., Ex. 8 to Pl.'s 56.1; Gonzales Aff., Ex. 9 to Pl.'s 56.1; Castillo Aff., Ex. 10 to Pl.'s 56.1.)  Plaintiff Trapaga's affidavit contains the briefest "Verification" statement and also incorrectly identifies the declarant: "I, Oscar Lopez, swear on my oath that above statements by me are true."  (Trapaga Aff., Ex. 1 to Pl.'s 56.1, at 4.)  In addition, Trapaga's verification statement is dated July 25, 2006, whereas the statements to which he presumably attests carry the date September 1, 2006.  Hernandez's affidavit contains no verification statement whatsoever.  (Hernandez Aff., Ex. 11 to Pl.'s 56.1.)  Defendant urges that as none of the verification statements contains the "under penalty of perjury" language, the affiants are not subject to prosecution under the federal perjury statute, 18 U.S.C. § 1861; therefore, the affidavits do not satisfy 28 U.S.C. § 1746 and are thus inadmissible for summary judgment

---

[4]    Technically speaking, therefore, Plaintiffs' submissions are not affidavits at all, but declarations.  Nonetheless, because both parties refer to these statements as "affidavits," the court uses that terminology here.

purposes under Rule 56(e).

Significantly, Plaintiffs are not proceeding *pro se* in this action.[5]  Each affidavit states that it was prepared by Plaintiffs' counsel, who acknowledges in his response to Defendant's motion to strike that he personally drafted the affidavits and deliberately chose the above language. (Plaintiffs' Response to Motion to Strike Certain Exhibits ("Pl.'s Aff. Resp."), at 2.)  Counsel explains that because the affiants are "factory workers who speak little or no English," "the affidavits omit the literal word 'perjury' (or its Spanish equivalent '*jur perjurio*')" in favor of "language more meaningful and understandable to lay witnesses, particularly those with little sophistication or education." (*Id.* at 1-2.)  Plaintiffs' counsel deems it "obvious that the simplified, non-technical language serves the interests of justice more meaningfully than the technical term 'perjury.'" (*Id.* at 2.)  Counsel nevertheless assures the court that "Plaintiffs have redrafted the verifications to include the literal word 'perjury,'" and that he "will move to substitute same for the affidavits originally filed." (*Id.*)  Counsel made these representations in a filing dated October 25, 2006; as of March 28, 2007, no such motion has been filed.

Plaintiffs' counsel maintains that the affidavits currently before the court are sufficient in any event.  Citing the Seventh Circuit's decision in *Pfeil*, counsel contends that "Plaintiffs' intentions were to make more certain that [§ 1746] in substance was followed." (*Id.* at 3.)  Counsel further, and inexplicably, cites the Illinois equivalent of § 1746 and contends that the affidavits are sufficient because the affiants would be subject to Illinois perjury penalties.  (*Id.* at 3-4 (citing 735 ILCS 5/1-109).)  Counsel neglects to mention the federal perjury statute, 18 U.S.C. § 1861, and ignores the fact that the Illinois statute imposes criminal liability for false statements in verified or sworn documents "filed in any *court of this State*." 735 ILCS 5/1-109 (emphasis added).

*Pfeil*, though it contains language that is, at first blush, sympathetic to Plaintiffs' position, is

---

[5]    Plaintiffs filed a *pro se* complaint on October 5, 2005 and initially proceeded without counsel, but subsequently obtained counsel who entered an appearance on April 27, 2006.

not directly applicable. There, the challenged affidavits were sworn to before a notary; the claimed defect was that they lacked the notary's seal. *Pfeil*, 757 F.2d at 858-59. The court observed that "in the interests of justice, a district court should not be unnecessarily hyper-technical and overly harsh on a party who unintentionally fails to make certain that all technical, non-substantive requirements of execution are satisfied." *Id.* at 859. The fact that the *Pfeil* affidavits were indeed sworn, combined with the fact that the documents otherwise "complied with" § 1746, was sufficient to allow the court to consider the affidavits on summary judgment. *Id.* Here, as noted, none of the affidavits at issue were sworn to before a notary. Moreover, none of the affiants "unintentionally" failed to conform with procedural requirements; rather, as noted, Plaintiffs' counsel by his account deliberately drafted the verification statements in a self-proclaimed attempt to improve upon the statutory language of § 1746.

In *Ghazi v. Fiserv, Inc.*, 904 F. Supp. 823, 827 (N.D. Ill. 1995), cited by Defendant, the court rejected two affidavits because they were improperly notarized and also failed to satisfy § 1746 in that "neither affiant states that he or she declares the contents of the affidavit to be true under the penalty of perjury." In *Stewart v. Core Laboratories, Inc.*, 460 F. Supp. 931, 938-39 (N.D. Tex. 1978), the unsworn declaration was insufficient because even though the affiant stated that its contents were true, she left out the "under penalty of perjury" language altogether. Neither decision addresses the issue here: whether an affidavit can satisfy § 1746 if it lacks the statutory "under penalty of perjury" language, but does contain some kind of re-formulating or paraphrasing of that language.

Section 1746 itself does not require strict compliance with the "verification" statement provided as an example: the statute provides that an unsworn declaration "in substantially the following form" will be sufficient, followed by the exemplary sentence "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct." 28 U.S.C. § 1746. As noted by the court in *In re Muscatell*, 106 B.R. 307, 309 (Bankr. M.D. Fla. 1989), however, the

"under penalty of perjury" language appears elsewhere in the statute. Preceding the example, § 1746 specifically states that an unsworn declaration must be "in writing of such person which is subscribed by him, as true *under penalty of perjury . . . .*" 28 U.S.C. § 1746 (emphasis added). The *Muscatell* court thus concluded that an unsworn declaration will not satisfy § 1746 unless it both states that the writing is true and "includes the phrase, 'penalty of perjury.'" 106 B.R. at 309. The declaration failed in that case because the declarant signed under penalty of perjury, but failed to declare the contents of the statement true and correct. *Id.*

The Second Circuit reached a different result in *LeBoeuf, Lamb, Greene & MacRae, L.L.P. v. Worsham*, 185 F.3d 61 (2d Cir. 1999). There, the defendant submitted an unsworn letter that stated "Under penalty of perjury, I make the statements contained herein." Noting that § 1746 only requires that a verification statement be in "substantially" the form of the statutory example, the court held that the absence of "true and correct" language was not fatal; even if the letter "d[id] not contain the exact language of Section 1746," it "substantially complie[d]" with the statute. *Id.* at 65-66. The court did not indicate, however, whether a declaration that omitted the "under penalty of perjury" language would still be sufficient.

Indeed, Plaintiffs' counsel points to no case in which any court has considered, as admissible evidence in a summary judgment proceeding, an unsworn declaration in which the declarant fails to explicitly attest to the truth of the statements therein "under penalty of perjury." Nor is the court aware of any authority holding that a declaration is admissible pursuant to § 1746 without such language. Defendant, citing *Stewart*, labels this language "essential" because without it, the declarant is not subject to a perjury prosecution under federal law. (Defendant's Reply Memorandum in Support of Its Motion to Strike Affidavits in Whole or in Part ("Def.'s Aff. Reply"), at 3.) *See Stewart*, 460 F. Supp. at 939 (by leaving out "essential language" that declaration was "true 'under penalty of perjury,'" declarant not subject to prosecution for perjury under 18 U.S.C. § 1861). As noted, however, *Stewart* did not involve a verification statement that nonetheless

contained language purporting to be the equivalent of "under penalty of perjury."

Defendant is correct that a court may not consider an unsworn declaration unless it subjects the declarant to penalties of perjury. *See DeBruyne*, 920 F.2d at 471 (citing 28 U.S.C. § 1746). This court is not satisfied that the purportedly equivalent language in the affidavits submitted here, including "under penalty of the law requir[ing] everyone to tell the [truth]," "the law for telling the truth," or simply "the law," would bring the affidavits within the purview of the federal perjury statute. That statute imposes criminal liability on a person who, "in any declaration, certificate, verification, or statement *under penalty of perjury* as permitted under [§ 1746], willfully subscribes as true any material matter which he does not believe to be true[.]" 18 U.S.C. § 1861(2) (emphasis added). Section 1863 in turn provides for fine or imprisonment for those who "under oath (or in any declaration, certificate, verification, or statement *under penalty of perjury* as permitted under [§ 1746]) in any proceeding before [any court of the United States] knowingly makes any false material declaration . . . ." 18 U.S.C. § 1863(a) (emphasis added). According to these provisions, a prerequisite to perjury liability is that the declaration be made "under penalty of perjury" in accordance with § 1746.

The repeated references to the phrase "under penalty of perjury" in 18 U.S.C. §§ 1861 & 1862 and in 28 U.S.C. § 1746 are compelling. Moreover, this court, like the court in *Muscatell*, finds persuasive the fact that preceding the sample verification statement that a declarant need only "substantially" follow, § 1746 explicitly requires an unsworn declaration to be "in writing of such person which is subscribed by him, as true *under penalty of perjury* . . . ." 28 U.S.C. § 1746 (emphasis added). Section 1746 thus does not appear to contemplate the validity of an unsworn declaration that does not contain this language.

Although the court can locate no authority supporting a construction of § 1746 that would allow the affidavits submitted by Plaintiffs to stand, the court notes the possibility of a less formalistic approach to the issue. Under this approach, the relevant inquiry would not be whether

8

the affiants used the precise statutory language—or "substantially similar" language—in their verification statements, but whether the language used suggests that the affiants were aware that by signing the affidavits, they would be subject to penalties for perjury. In this sense, an affiant who signs "under penalty of the law requir[ing] everyone to tell the [truth]," as in the Lopez and Vasquez affidavits, or "under penalty of the law for telling the truth," as in both Garduno affidavits, appears to be aware of the general concept of perjury, including that the affiant is required to tell the truth and that there will be adverse legal consequences for making an false statement. This inference becomes weaker when the affiant signs only "under penalties of the law," as in the Cisneros, Orozsco, Gonzales, and Castillo affidavits, for that language fails to indicate any specific legal concept of which the affiant is aware. The inference disappears altogether with respect to Plaintiff Trapaga's affidavit, which contains no language suggesting Trapaga signed with awareness of any legal penalty for not being truthful, and with respect to Hernandez's affidavit, which entirely omits any kind of verification statement.

The court also finds disturbing several other issues relating to these affidavits. Plaintiffs' counsel's proffered explanation—that he was trying to improve upon the language explicitly provided in § 1746 to "serve[] the interests of justice more meaningfully"—is less than wholly plausible. Counsel himself acknowledges the existence of an obviously close translation of the relevant expression in Spanish. As Defendant points out, a more sensible course, if the affiants nevertheless really had as little understanding of the word "perjury" as counsel asserts, would have been simply to explain the concept to the affiants and then include the statutory language in their certifications. Furthermore, counsel represented to this court over five months ago that the affidavits had been re-drafted, and that he would move the court to submit them; to this date, no such motion has been forthcoming. Finally, as noted, these affidavits make up nearly the whole of Plaintiffs' evidentiary response to Defendant's motion for summary judgment, and their contents

are largely devoted to denying facts presented in Defendant's affidavits and other evidence.[6]  In short, the challenged affidavits may be the only thing standing between Plaintiffs and a grant of summary judgment for Defendant; yet in light of their unorthodox verification statements, these affidavits are of dubious validity.

Given Plaintiffs' near-exclusive reliance on the challenged affidavits, one would think that Plaintiffs' counsel would have made every attempt to ensure their admissibility, either by having them notarized, by following § 1746 more carefully, or at the very least by following through on his own promise to submit re-drafted affidavits.  By doing none of those things, Plaintiffs' counsel has put his clients' case in jeopardy.  Nonetheless, the court is reluctant to punish Plaintiffs for their counsel's inexplicably careless interpretation of evidentiary requirements.  For purposes of this ruling, the court will consider an affidavit that lacks the express "under penalty of perjury" language, if, as explained above, the affidavit contains language indicating that the affiant was aware when signing the affidavit that he or she would be subject to penalties for perjury.

Under this standard, the Lopez, Vasquez, and both Garduno affidavits, which state that the affiants signed under the penalty of "the law requir[ing] everyone to tell the [truth]" or "the law for telling the truth," are sufficiently verified.  This language suggests that the affiants knew that they were required to tell the truth and that there would be adverse legal consequences for not doing so.  The affidavits of Cisneros, Orozsco, Gonzales, and Castillo, however, which attest to the truth of the statements therein only "under penalties of the law," are not sufficient; that language is simply too vague to suggest that the affiants knew they were signing under penalty of perjury.  The court strikes those four affidavits in their entirety, as well as the Hernandez affidavit, which contains no verification statement whatsoever.

---

[6]     For example, in response to Defendant's assertion that Plaintiffs had met several times with Antonio Rios (which assertion Defendant supports with Rios' affidavit), Plaintiff Vasquez states in his affidavit that he had read Rios' affidavit and that "there were no meetings . . . .  Rios is lying."  (Vasquez Aff. ¶ 5.)

The court also strikes Plaintiff Trapaga's affidavit, which suffers from a number of problems. In his verification statement, Trapaga swears that "above statements by me are true," but uses no language suggesting an awareness of the penalties of perjury. (Trapaga Aff., at 4.) He does begin his affidavit by certifying "on my oath and under penalty of the law that the following is the truth," (*id.* at 1); this language suffers from the same defect of vagueness noted above. Moreover, the declarant identifies himself in the verification statement as "Oscar Lopez" and attests, on July 25, 2006, to the truth of statements dated September 1, 2006—six weeks later. Although Defendant urges that the affidavit be stricken on the basis of improper "cutting and pasting," it is not clear to the court that even "cutting and pasting" explains the misnomer and faulty date. There is no individual named "Oscar Lopez" in this action; there is an "Oscar Trapaga" and a "Jose Lopez." Nor does any verification statement on any of the affidavits carry the date July 25, 2006. Plaintiffs' counsel characterizes these issues as "obvious typos and inadvertent errors," states that "Plaintiffs have corrected these technical and inadvertent oversights," and again promises that he "will move the Court" to substitute a corrected affidavit. (Pl.'s Aff. Resp., at 4.) Again, however, counsel has failed to do so. Accordingly, the Trapaga affidavit is stricken in its entirety.

### 2. Authentication of Translated Material

Defendant also contends that the affidavits of Trapaga, Matiana Garduno, Oroszco, and Gonzales lack proper authentication of testimony translated from Spanish. As explained above, the court strikes the Trapaga, Oroszco, and Gonzales affidavits for improper verification. The court agrees with Defendant that these documents are improperly authenticated as well, and further strikes Matiana Garduno's affidavit for that reason.

Documentary evidence is admissible if authenticated "by evidence sufficient to support a finding that the matter in question is what its proponent claims." FED. R. EVID. 901(a). Written translations are subject to this authentication requirement. *United States v. Nouira*, No. 06-CR-135 (JBW), 2006 WL 2417245, at *2 (E.D.N.Y. Aug. 21, 2006) (Weinstein, J.); *see* FED. R. EVID. 604

("[a]n interpreter is subject to the provisions of [the Federal Rules of Evidence] relating to qualification as an expert and the administration of an oath or affirmation to make a true translation."). Therefore, "[w]itness testimony translated from a foreign language must be properly authenticated and any interpretation must be shown to be an accurate translation done by a competent translator." *Jack v. Trans World Airlines, Inc.*, 854 F. Supp. 654, 659 (N.D. Cal. 1994) (citing FED. R. EVID. 604 & 901).

Trapaga's affidavit contains an undated "Translator's Certificate" in which Plaintiff Vasquez, who states he is fluent in Spanish and English, certifies that he "accurately translated the above testimony of Jose Lopez from Spanish to English." (Trapaga Aff., at 4.) As the same material is appended to Lopez's affidavit, Plaintiffs' counsel appears to have cut and pasted the translation verification from that document to Trapaga's affidavit. This is improper, as the court cannot ascertain whether Vasquez in fact translated Trapaga's testimony, or whether that translation represents an accurate portrayal of that testimony. *See Quiroga v. Fall River Music, Inc.*, No. 93 CIV. 3914(RPP), 1998 WL 851574, at *26 n.24 (S.D.N.Y. 1998) (cutting and pasting of text of affidavit and verification signature on translation constitutes tampering). Similarly, in Matiana Garduno's affidavit, Luz Maria Garduno certifies that she accurately translated the testimony of "Ernesto Garduno"—a certification clearly cut and pasted from Ernesto Garduno's affidavit.

Finally, Plaintiffs' counsel has attached, to the Orozsco and Gonzales affidavits, what the court assumes are Spanish-language versions of those affidavits. Both affiants state in the English-language versions that Spanish is their native language but that they speak some English. (Orozsco Aff. ¶ 1; Gonzales Aff. ¶ 1.) The English-language versions are (improperly) verified as discussed above; the Spanish-language versions contain no date, signature, or verification. Although the English-language versions appear to be translations of the Spanish-language versions, neither contains any translator's verification or other indication that the testimony was accurately translated. The affidavits are thus not properly authenticated. *See Consejo de*

*Desarrollo Economico de Mexicali, AC v. United States*, 438 F. Supp. 2d 1207, 1226 (D. Nev. 2006) (striking declarations that appeared to have been written originally in Spanish and later translated into English, absent any indication that the English versions of the declarations were true and correct translations); *Jack*, 854 F. Supp. at 659 (striking plaintiffs' English-language affidavits where foreign-language versions were attached with no explanation regarding translation, and plaintiffs' unsworn statement that translations were accurate failed to cure the defect).

Plaintiffs' counsel responds to these deficiencies in authentication by maintaining that they resulted from inadvertent error. Counsel again asserts that the affidavits have been re-drafted to cure any defects, and represents that he will seek leave to allow substitution of the originals. (Pl.'s Aff. Resp., at 4.) As noted, counsel has not done so.

The court therefore strikes the Trapaga, Matiana Garduno, Cisneros, Orozsco, Gonzales, Castillo, and Hernandez affidavits in their entirety, on the basis of improper verification and/or authentication. With respect to the remaining affidavits from Plaintiff Lopez, Plaintiff Vasquez, and Ernesto Garduno, the court considers Defendant's objections to their substantive content where Plaintiffs rely on those affidavits for evidentiary support, as noted herein.

**B.     Motion to Strike Plaintiffs' LR 56.1 Materials**

Defendant moves to strike portions of Plaintiffs' LR 56.1 statement of additional facts that rely on the above affidavits, and further urges the court to strike certain paragraphs in Plaintiffs' LR 56.1 materials for failure to comply with LR 56.1 on a number of technical grounds. The court grants Defendant's motion with respect to any factual assertion that relies exclusively on one or more of the stricken affidavits for evidentiary support. Thus, paragraphs 109, 119, and 120 of Plaintiffs' LR 56.1 statement of additional facts are stricken. Furthermore, where Plaintiffs cite to both stricken and non-stricken affidavits, the court will disregard the citation to the stricken material when evaluating whether Plaintiffs' assertions are supported by record evidence.

Defendant further asks the court to deem facts contained in certain paragraphs of

Defendant's LR 56.1 statement admitted because Plaintiffs offered no response to those paragraphs, (Def.'s 56.1 Mem. ¶ 15); to strike Plaintiffs' responses that include statements of additional fact, legal argument or narrative, or incomplete citations to the record, (*id.* ¶¶ 16-19); and to strike Plaintiffs' statements of additional fact to the extent that Plaintiffs' assertions are unsupported by the cited evidence, are irrelevant, or consist of conclusory statements or argument. (*Id.* ¶¶ 23-32.)  The court agrees that Plaintiffs have to a large degree failed to comply with LR 56.1.[7]  Rather than address Defendant's motion with regard to specific deficiencies here, however, the court will sustain Defendant's objections where appropriate, with or without comment, in the course of this opinion.

## II.    Facts

### A.    The Parties

Plaintiffs Trapaga, Lopez, and Mark Vasquez are former employees of Edsal, which makes steel shelves and related items.  (Def.'s 56.1 ¶¶ 8-9.)  Defendant Local 10, whose full and correct name is "Production Workers Union, Local 10," was a labor organization at all relevant times prior to June 30, 2004, when it merged with another union local and ceased to exist.  (*Id.* ¶ 5.)  Local 10 was affiliated with the Central States Joint Board ("CSJB"), a labor organization consisting of several other labor organizations.[8]  (*Id.* ¶¶ 4,6.)

In April 2003 and continuing through June 30, 2004, Local 10 was the exclusive bargaining representative of a unit of Edsal's production and maintenance employees.   (*Id.* ¶ 11.)  Approximately 900 employees, including Plaintiffs, were in that bargaining unit.  (*Id.* ¶ 12.)  CSJB

---

[7]    Plaintiffs' counsel fails to respond to Defendant's arguments that Plaintiffs LR 56.1 materials do not conform to the rule.  Indeed, with respect to several such arguments, counsel simply notes Defendant's position and states, without elaboration, "Plaintiffs disagree."  (Plaintiffs' Response to Motion to Strike Plaintiffs' Response to Defendants' Rule 56.1(a)(3) Statement of Facts and Plaintiffs' Additional Facts ("Pl.'s 56.1 Mem. Resp.") ¶¶ 5-8.)

[8]    There is no entity named "Central States Joint Board Local 10," the named defendant in this suit.  (*Id.* ¶ 7.)

business agents Wayne Woodard and Antonio Rios were assigned by CSJB to assist Local 10 in representing the Edsal employees in Local 10's bargaining unit.  (*Id.* ¶ 13.)

Edsal and Local 10 were parties to a collective bargaining agreement (the "CBA") governing the terms and conditions of Edsal employees' employment.  (*Id.* ¶ 14.)  The CBA permits Edsal to, *inter alia*, establish reasonable work rules and discipline, and discharge employees for cause.  (*Id.* ¶ 15.)  The CBA also contains a grievance procedure covering any difference of opinion with respect to the meaning and application of the CBA's terms and conditions.  (*Id.* ¶ 16.)  The grievance procedure culminates in final and binding arbitration.  (*Id.* ¶ 17.)

Since prior to April 2003, Edsal maintained written work rules that it distributed to its employees.  (*Id.* ¶ 18.)  Work Rule 28 prohibits an employee from engaging in "[i]mproper or immoral conduct which reflects in any way on the Company or on the employee's ability to perform his job."  (*Id.* ¶ 19; Work Rules ¶ 28, Ex. 25 to Def.'s 56.1.)  The rule calls for discharge upon the first offense.  (Def.'s 56.1 ¶ 19 (citing Work Rules ¶ 28).)  Work Rule 29 prohibits an employee from engaging "in solicitation of any kind" and from distributing literature on Edsal property during working hours.  (*Id.* ¶ 20; Work Rules ¶ 29.)  This rule defines "solicitation" as including "sales of products . . . or solicitation of membership in or support for any organization or cause."  (Work Rules ¶ 29.)  In contrast to Rule 28, Rule 29 provides for a four-step progressive disciplinary procedure: a verbal warning for the first offense, a written warning for the second and third offenses, and discharge upon the fourth offense.  (*Id.*; Def.'s 56.1 ¶ 20.)

### B.    Plaintiffs' Terminations

In or around April 2003, another labor organization, the United Electrical, Radio and Machine Workers of America (the "UE") began an organizing drive among Edsal employees then represented by Local 10.  (Def.'s 56.1 ¶ 21.)  As part of UE's organizing drive, Edsal employees circulated petitions which they asked other employees to sign to demonstrate their support for the UE.  (*Id.* ¶ 22.)  Neither party identifies which or how many employees participated in the UE

organizing drive, nor explains, in its LR 56.1 statement, the extent of Plaintiffs' involvement. The court notes, however, that in their NLRB affidavits, Plaintiffs Trapaga, Lopez, and Vasquez all testified that they collected signatures for UE petitions, but only during breaks.[9] (NLRB Trapaga Aff., at 3-4; NLRB Lopez Aff., at 1; NLRB Vasquez Aff., at 2.)

Defendant asserts that on or about May 8, 2003, Edsal posted a notice to employees reminding them that Edsal rules prohibit solicitation during working hours and in work areas. (Def.'s 56.1 ¶ 23.) To support this assertion, Defendant cites to the affidavit of CJSB business agent Rios, and to a undated copy of this posting that Rios authenticates. (Rios Aff. ¶ 23, Ex. 1 to Def.'s 56.1; Notice, Ex. 12 to Def.'s 56.1.) Plaintiffs deny this assertion, citing to the affidavits of Plaintiffs Lopez and Vasquez, who state that "there was no special notice posted"; Vasquez further states that he would know because he checked the bulletin board every day. (Lopez Aff. ¶ 9; Vasquez Aff. ¶ 9.) Plaintiffs also cite to the deposition testimony of Edsal employee Jose Trevino, who, when shown a copy of the posting identical to that cited by Defendant, testified that he had never seen it before. (Trevino Dep., at 60.)

On May 13, 2003, Edsal suspended Plaintiffs and Trevino, pending an investigation, for disrupting the workforce on company property and on company time by soliciting employees for the UE. (Def.'s 56.1 ¶ 24.) Plaintiffs' and Trevino's suspension notices, copies of which are included in Defendant's LR 56.1 materials, do not mention solicitation but instead cite Edsal's prohibition of "improper conduct" in accusing the recipients of "disrupting the workforce." (*E.g.*, Employee Warning for Mark Vasquez, Ex. 15 to Def.'s 56.1.) Rios' affidavit asserts, however, that it was the employees' solicitation activities that constituted that disruption.[10] (Rios Aff. ¶ 24.)

---

[9]    Lopez's and Vasquez's NLRB affidavits acknowledge, however, that they collected signatures on company property; Lopez did so in the company parking lot and Vasquez on a loading dock. (NLRB Lopez Aff., at 1; NLRB Vasquez Aff., at 2.)

[10]    Plaintiff admits Defendant's assertion "with the exception" that Plaintiff Lopez was
(continued...)

Plaintiffs and Trevino swiftly filed grievances: Lopez on May 13, 2003, Trevino and Trapaga on May 14, and Vasquez on May 19. (Def.'s 56.1 ¶¶ 25-28.) On May 22, 2003, Woodward and Rios, representing the suspended employees at a grievance meeting with Edsal, urged their reinstatement. (*Id.* ¶¶ 31-32.) Edsal refused Local 10's request the following day and denied the grievances. (*Id.* ¶ 33.) On May 29, 2003, Edsal discharged Plaintiffs and Trevino. (*Id.* ¶ 34.) Their identical termination notices stated that "[t]he reason for the termination was based on rule violation [*sic*] causing disruption in the work place during work hours/interference." (Termination Notice for Jose Lopez, Ex. 21 to Def.'s 56.1.) The notices stated, further, that all Edsal employees had recently been "notified in writing that solicitation of any kind during the work day, during the work hours which interferes with production" would result in discipline "if any employee violates this rule." (*Id.*) Each notice then informed the discharged employee that he had "recently committed repeated violations of this rule." (*Id.*) Although the notices do not mention the UE, Defendant again asserts, supported by Rios' affidavit, that the four employees were terminated "for disrupting the workplace by soliciting for the UE." (Def.'s 56.1 ¶ 34.) Plaintiffs do not challenge this assertion. (Pl.'s 56.1 ¶¶ 25-39 (explicitly admitting Defendant's assertions in those paragraphs).)

### C.    Arbitration Preparations

Local 10 demanded arbitration of Plaintiffs' and Trevino's grievances on June 13, 2003, and arranged for attorney James Ward[11] to process those grievances through arbitration. (Def.'s 56.1 ¶¶ 35-36.) On August 15, 2003, Ward and Rios met with representatives from Edsal and negotiated a settlement agreement that required Edsal to reinstate Plaintiffs and Trevino

---

[10](...continued)
unaware of any work disruption charge. (Pl.'s 56.1 Resp. ¶ 24.) This denial is unsupported, as the cited portion of Lopez's affidavit asserts only that there was no discussion of a work disruption charge—only solicitation—during Plaintiffs' arbitration hearing seven months later. (Lopez Aff. ¶ 7.) Lopez's suspension notice, like the others, clearly states that he was suspended for "disrupting the workforce." (Employee Warning for Jose Lopez, Ex. 19 to Def.'s 56.1.)

[11]    Attorney Ward also represents Local 10 in this action.

immediately with full benefits and seniority but without back pay. (*Id.* ¶¶ 37-38; Settlement Agreement and Release, Ex. 3, 4, 5, & 6 to Def.'s 56.1.) In a note, handwritten in Spanish and signed by all four, (Ex. 7 to Def.'s 56.1), the grievants rejected the proposed settlement, instead demanding that Edsal unconditionally reinstate them with seniority, benefits, and full back pay, that Edsal remove their disqualification from unemployment, and that "there be no discrimination by Edsal's supervisors or its personnel manager." (Def.'s 56.1 ¶ 39.)

A point of dispute between the parties concerns the extent of Local 10's preparation for the arbitration hearing, which was scheduled for December 4, 2003 before Arbitrator Victor G. Smith at Local 10's Chicago offices. (*Id.* ¶ 42.) Citing to Rios' affidavit, Defendant asserts that Rios and attorney Ward met with Plaintiffs and Trevino on October 21, 2003, at Local 10's offices "to begin preparations" for the hearing. (*Id.* ¶ 40.) During the meeting, according to Rios' affidavit, Ward interviewed the four grievants "concerning the events leading to their discharges and attempted to gather evidence and develop a strategy." (*Id.* ¶ 41 (citing Rios Aff. ¶ 39).) A second meeting assertedly occurred on November 19, 2003, during which Ward and Rios advised Plaintiffs and Trevino that they were planning to argue to the arbitrator that "there was other solicitation at Edsal and that the actions that they had been accused of had not disrupted the work force any more than these other solicitations." (*Id.* ¶ 44-45 (citing Rios Aff. ¶ 42).) According to Defendant, all four grievants "agreed with this strategy," after which they discussed with Rios and Ward what additional evidence would be needed for the hearing. (*Id.* ¶ 46 (citing Rios Aff. ¶ 42).)

Plaintiffs deny that either meeting occurred. (Pl.'s 56.1 ¶¶ 40-41, 44-46.) Plaintiffs cite to their own affidavits, in which Lopez states "[t]here were absolutely no meetings with Atty. Ward, Antonio Rios or any other Local 10 official before the arbitration to prepare for the arbitration," (Lopez Aff. ¶ 4), and Vasquez similarly maintains "there were no meetings with me (and to my knowledge with Trapaga, Lopez, and Trevino), Atty. Ward, Antonio Rios or any other Local 10

official before the Arbitration to prepare for it.  Rios is lying."[12]  (Vasquez Aff. ¶ 5.)  Vasquez and

Lopez further state in their affidavits that they, Trapaga and Trevino "sent four letters" to Local 10

because, according to Vasquez, they "wanted to know who the witnesses were against us."  (*Id.*

¶ 4; Lopez Aff. ¶ 4.)  Although Vasquez asserts that Plaintiffs sent the four letters "by certified mail,"

(Vasquez Aff. ¶ 4), the record contains no documentary evidence of these letters.

Plaintiffs also cite to Trevino's deposition testimony, in which Trevino answered "no" when

asked if he had met with Rios and "the lawyer from the Union" on October 21 and on November 19.

(Trevino Dep., at 68.)  Trevino further testified that he first met Ward on December 4, 2003—the

day of the arbitration hearing—and that he had not met with Ward or Rios prior to that date.  (*Id.*

at 68-69.)

It is undisputed, however, that on November 13, 2003—between the two meetings whose

existence is in dispute—Ward demanded and later obtained certain documents and other

information relating to the discharge of Plaintiffs and Trevino.  (Def.'s 56.1 ¶ 43.)  Among the

materials sought by Ward were the grievants' personnel files, documents relating to their

terminations or explaining Edsal's reasons for the terminations, and "documents showing prior

enforcement of the rule concerning solicitation of employees, including the identity of employees

involved and the acts alleged to constitute a violation and the nature of the discipline involved."

(Letter from Ward to Hayes of November 13, 2003, Ex. 9 to Def.'s 56.1.)

Defendant also asserts that Ward and Rios met with Plaintiffs on December 4, 2003 to

"further prepare" for the arbitration hearing, and that at this meeting, Ward "reviewed the strategy

---

[12]      Trapaga makes similar assertions in his affidavit, which the court has stricken.  The court notes, however, that in Trapaga's initial, *pro se* response to Defendant's LR 56.1 statement, which was withdrawn upon Plaintiffs' retention of counsel, Trapaga admitted to attending both the October 21 and the November 19 meetings.  (Answer to Defendant's Rule 56.1 Statement of Material Facts as to Which There Is No Material Dispute (29) ¶¶ 40-41, 46, 48 (filed Jan. 31, 2006).)  *See* Order of 3/22/2006 (Plaintiffs' submissions in opposition to summary judgment withdrawn).  Neither Lopez nor Vasquez had filed responses to Defendant's LR 56.1 statement, prior to appearance of counsel on their behalf.

and evidence that had been gathered to date, reviewed the procedures for the arbitration hearing and prepared [Plaintiffs] and Trevino for testimony." (Def.'s 56.1 ¶¶ 47-48 (citing Rios Aff. ¶ 43).) Plaintiffs again deny that any such meeting occurred, asserting that "Ward did no preparation with Plaintiffs on December 4." (Pl.'s 56.1 ¶ 48[13].) Plaintiffs again cite to their own affidavits, which state that Ward did not meet with them until "shortly before" or "just before" the grievants testified on the second day of the arbitration hearing in January 2004.[14] (Lopez Aff. ¶ 4; Vasquez Aff. ¶ 5.)

Finally, it is undisputed that on the morning of December 4, 2003, prior to the commencement of the hearing, Ward and Rios negotiated another proposed settlement with Edsal representatives. (Def.'s 56.1 ¶ 49.) In that proposed settlement, Edsal offered Plaintiffs and Trevino $3,000 each to resolve the matter and waive any right to reinstatement. (*Id.* ¶ 50.) All four rejected the offer, again insisting on reinstatement with back pay. (*Id.* ¶ 51.)

### D. Arbitration Hearing

#### 1. Proceedings on December 4, 2003

The arbitration hearing began on December 4, 2003. (*Id.* ¶ 52.) That day's proceedings consisted of Edsal's case in chief, (*id.* ¶ 56), in which Edsal called witnesses including six employees. (*Id.* ¶ 53.) The employee witnesses testified, generally, that Plaintiffs had solicited them to sign UE petitions during work hours, thus interfering with their work, or that they had seen Plaintiffs soliciting others or circulating petitions. (Edsal Manufacturing Co. and Production Workers Union Local 10 AFL-CIO, NLRB Case No. 13-CA-41361-3 (May 2004) (Smith, Arb.) (the "Arbitration Decision"), Ex. 53 to Def.'s 56.1, at 12-15.) Ward, on behalf of Local 10, cross-examined each

---

[13] Although Plaintiffs did not respond to Defendant's paragraph 47, the court construes the denial in paragraph 48 as a denial of paragraph 47 as well.

[14] After proceedings on December 4, 2003, the hearing was continued to January 9, 2004. (Def.'s 56.1 ¶ 57.)

Although Plaintiffs also cite to Trevino's deposition to support their denial of any meeting on December 4, he testified that he had not met with Ward or Rios *before* December 4, and was not asked whether a meeting occurred on that day. (Trevino Dep., at 69-70.)

Edsal witness, and objected to documentary and testimonial evidence Edsal sought to introduce.[15] (Def.'s 56.1 ¶ 54.) Several witnesses were subject to "heavy cross examination" by Ward. (Arbitration Decision, at 15-16.) Specifically, Ward "aggressively questioned witnesses relative to solicitation of other kinds such as purchases of various merchandise"; Arbitrator Smith overruled Edsal's objection that this line of questioning was outside the scope of direct examination. (*Id.* at 16.) All Edsal's witnesses denied knowledge of such other solicitation. (*Id.*)

At the conclusion of Edsal's case in chief on December 4, Defendant asserts that Plaintiffs and Trevino told Smith that they were satisfied with their interpreter, the hearing proceedings, and their representation by Local 10. (Def.'s 56.1 ¶ 56.) Plaintiff purports to deny this assertion, citing to Lopez's statement in his affidavit that "[a]nything I signed at the arbitration I signed not knowing what it meant," (Lopez Aff. ¶ 6), and to a portion of Trevino's deposition testimony in which he states that he printed, rather than signed, his name on a stipulation indicating that he was present at the hearing. (Trevino Dep., at 74-75.) None of this evidence rebuts Defendant's assertion that Plaintiffs and Trevino told Arbitrator Smith at the hearing that "they were satisfied with their interpreter, communications and translation; with the hearing proceedings and their representation." (Arbitration Decision, at 17.) Smith's affidavit confirms that he "asked the four grievants whether they were satisfied with their interpretation, communications, translation, procedures and representation," that these "questions were translated for them into Spanish," and that each grievant "answered yes to my questions, indicating that they were satisfied." (Smith Aff. ¶ 10.)

Plaintiffs further assert that Defendant "fail[ed] to provide an interpreter for Lopez and

---

[15]     Ward objected to Edsal's offering a 1997 "discharge Arbitration Award" in which Smith had "mediated a settlement returning Grievant Vasquez to work." (Arbitration Decision, at 16.) Smith noted the objection but accepted the evidence. (*Id.* at 17.)
     It is undisputed that in 1997, Local 10 had successfully represented Mark Vasquez in a grievance protesting his improper termination by Edsal, by reaching a settlement on the day of arbitration, pursuant to which he was reinstated. (Def.'s 56.1 ¶¶ 105-06.) Trapaga was present at the arbitration hearing as a witness and union steward. (*Id.* ¶ 108.)

Trapaga"[16] at the hearing. (Pl.'s 56.1 ¶ 118.) The only potential support for this assertion is found in Lopez's affidavit, in which he states "no one translated word for word for me." (Lopez Aff. ¶ 5.) Rios asserts in a supplemental affidavit that he "translated the testimony of several witnesses at the hearing who testified in Spanish," but "did not provide a continuous translation of the testimony presented" because "none of the grievants requested that [he] do so." (Rios Supp. Aff. ¶ 5, Ex. to Def.'s 56.1 Resp.) Arbitrator Smith also states that "both parties had a bi-lingual employee present at the hearing to translate their witnesses' testimony." (Smith Aff. ¶ 5, Ex. to Def.'s 56.1.) Smith further notes that three of Edsal's witnesses testified in Spanish, as did all Local 10's witnesses except for Plaintiff Vasquez. (*Id.* ¶¶ 8, 12.) Plaintiffs' assertion that Local 10 "fail[ed] to provide an interpreter" is thus unsupported; it appears that Rios indeed interpreted at least some of the proceedings, and that much of the testimony was in Spanish in any event. There is no evidence that either Lopez or Trapaga ever asked Local 10 for an interpreter or a continuous translation, however, or indicated that they were unhappy with the translation provided; indeed, although Lopez asserts in his affidavit that no one translated "word for word," he does not assert that he was unable to understand any part of the proceedings.

## 2. Proceedings on January 9, 2004

After the close of proceedings on December 4, the hearing was continued to January 9, 2004. (Def.'s 56.1 ¶ 57.) It is undisputed that on January 7, 2004, Ward and Rios met with Plaintiffs and Trevino, as well as their former co-workers (and current Edsal employees) Alicia Cisneros, Imelda Tzintzun, Prudencio Antunez, and Jose Barrerra, to gather evidence and to further prepare for the hearing. (*Id.* ¶¶ 58-59.) Plaintiffs, Trevino, and the employees all testified on

---

[16] Vasquez is fluent in both English and Spanish. (Vasquez Aff. ¶ 1.) Lopez "cannot read, understand or write English." (Lopez Aff. ¶ 1.) Trapaga's affidavit, which the court has stricken, states that he understands "some English." (Trapaga Aff. ¶ 1.)

January 9.  (*Id.* ¶ 59.)  The employees testified[17] that they had observed purchases of, or that they themselves had purchased, various merchandise on Edsal property such as Avon products, jewelry, clothes, and food.  (Arbitration Decision, at 17.)  Barrerra, who is Plaintiff Vasquez's nephew, testified that he never saw any of the grievants "passing around petitions," but that he saw other employees selling merchandise; he also testified, however, that the sales he observed occurred only during breaks and on lunch times.  (*Id.* at 17-18.)  Cisneros testified that she bought and sold Avon products and other items, but only before her shift or during breaks or lunch time.  (*Id.* at 18.)  She also testified that she had, days before, observed a man selling shoes in the department where the employees exchange their work gloves; she could identify the man only as the "dark guy."  (*Id.* at 18-19.)  Tzintzun testified to buying merchandise and observing sales, and that Trevino "never came to her with a petition."  (*Id.* at 19.)  Antunez testified that he bought chocolates from "the guy who hands out the gloves" during working hours, and that the "man with the gloves" also sold baskets, socks, and shoes.  (*Id.* at 20.)

Trapaga testified in relevant part that he had never seen Edsal's posting regarding its solicitation policy before being suspended, denied ever receiving information about that policy, and denied ever circulating a petition or even talking to other employees about a petition.  (*Id.* at 20.)  In fact, Trapaga stated that the first time he had heard about a possible change to a new union was May 13, 2003—testimony inconsistent, the court notes, with his NLRB affidavit, in which he described hearing about the UE on April 30, attending UE meetings on May 3 and May 10, and collecting signatures on a UE petition on May 12.  (NLRB Trapaga Aff., at 2-4.)  Trapaga's testimony was internally inconsistent as well, as he testified at another point that he had indeed attended a UE meeting on May 10, and that as a union steward he had been aware of the soliciting

---

[17]     The descriptions presented here of witness testimony and evidence are taken from Smith's summaries and descriptions in the Arbitration Decision, the accuracy of which is undisputed.  (Def.'s 56.1 ¶¶ 55, 60.)

policy. (Arbitration Decision, at 21-22.) As for the "glove man," Trapaga identified him as "Albert" and testified that he had purchased a "basket" from the man. (*Id.*)

Lopez denied being in a work area where other employees had been signing petitions, contrary to the testimony of one of Edsal's employee witnesses. (*Id.* at 24.) Vasquez denied having shown petitions on May 12 to other employees who had testified that he had done so. (*Id.* at 26-27.) As with Trapaga, Vasquez's testimony was inconsistent with his NLRB affidavit in which he stated that he had shown the petition and talked about the UE to other employees during each of his work breaks on May 12. (NLRB Vasquez Aff., at 2.) Trevino admitted to circulating petitions on May 12, 2003, but only outside the plant and before the start of his 7 a.m. shift; he maintained this position despite "heavy cross examination." (Arbitration Decision, at 22-23.)

At the conclusion of the hearing on January 9, 2004, Plaintiffs told Arbitrator Smith that they had received a full and complete hearing on the issues presented and had no further proof to offer; and they were satisfied with the translation, hearing procedures, and their representation.[18] (Def.'s 56.1 ¶ 67; Smith Aff. ¶ 16; Arbitration Decision, at 27.) Plaintiffs also signed a "Stipulation" in which they agreed that they had "had a full and complete hearing on the issue(s) and have no further proof to offer." (Def.'s 56.1 ¶ 68; Stipulation of January 9, 2004, Ex. 51 to Def.'s 56.1.) Although Plaintiff again cites to Lopez's statement in his affidavit that "[a]nything I signed at the arbitration I signed not knowing what it meant," (Lopez Aff. ¶ 6), this additional assertion does not contradict Defendant's assertion that Lopez signed the document.

Over the course of the two-day hearing, Edsal and Local 10 introduced seventeen joint exhibits into the record. (Def.'s 56.1 ¶ 61.) In addition, Local 10 introduced fifteen union exhibits, and Edsal introduced five employer exhibits. (*Id.* ¶¶ 62, 64.) On or about April 19, 2004, attorney

---

[18]     Plaintiffs' denial of this assertion relies on the same evidence they cite in denial of Defendant's similar assertion regarding the December 4, 2003 proceedings, (Pl.'s 56.1 Resp. ¶¶ 56, 67), and fails for the same reasons.

Ward filed a brief with Arbitrator Smith, containing a written summation of the proceedings. (*Id.* ¶ 69.) In that brief, Ward argued that Edsal lacked just cause to discharge Plaintiffs and Trevino because Edsal had "failed to prove that the actions these employees are accused of are materially different from the myriad examples of other solicitation that has been occurring at [Edsal]." (Letter from Ward to Smith of April 19, 2004, Ex. 52 to Def.'s 56.1, at 1.)

### 3. The Arbitrator's Decision

Arbitrator Smith issued his decision and arbitration award on May 22, 2004. (Def.'s 56.1 ¶ 70.) In his written decision, Smith concluded that Vasquez, Trapaga, and Lopez had been "disruptive" and had "interfered with production" at Edsal. (Arbitration Decision, at 34.) Smith credited Edsal's witnesses, and found the grievants' testimony "incredible and inconsistent." (*Id.* at 32.) With regard to Local 10's argument that other employees had also been soliciting but had not been similarly disciplined, Smith determined that there was "no evidence of disparate treatment." (*Id.* at 33.) Smith concluded that Plaintiff had been discharged for just cause under the terms of the CBA, and denied their grievances. (*Id.* at 35.) With respect to Trevino, however, Smith, observing that "no one saw Trevino interfering with any one else," concluded that his discharge was without just cause. (*Id.* at 34-35.) Smith converted Trevino's discharge to a suspension and ordered Edsal to reinstate him within five days.[19] (*Id.* at 35; Def.'s 56.1 ¶¶ 72-73.)

### E. Plaintiffs' Allegations of Discrimination

Plaintiffs contend in this action that Local 10, by failing to properly represent their interests in the handling of their grievances, intentionally discriminated against Plaintiffs on the basis of their national origin. To support this assertion, Plaintiffs assert, first, that "Edsal disparately enforced the work rule relating to work disruption" by failing to enforce the rule as to native-born employees, but that Local 10 "intentionally avoided gathering and presenting any evidence" of that disparate

---

[19] Edsal complied by offering to reinstate Trevino effective June 1, 2004, with no loss or seniority or benefits. (Def.'s 56.1 ¶ 74.) He returned to work on June 10. (Trevino Dep., at 7.)

enforcement and instead directed Plaintiffs themselves to "get evidence of other solicitations." (Pl.'s 56.1 ¶¶ 110-118.)  Second, Plaintiffs assert that Local 10 harbored racial animus towards its members of Mexican descent, as evidenced by statements made by Local 10 official Horatio Vasquez (no relation to Plaintiff Mark Vasquez), and by a "pattern of disparate treatment" favoring native-born union members.  (*Id.* ¶¶ 115-17.)  The court addresses these assertions, and Defendant's challenges to the materials on which Plaintiffs rely, here.

### 1. Local 10's Alleged Refusal to Present Evidence of Workplace Disruption and/or Disparate Treatment

Plaintiffs, citing their own affidavits and Trevino's testimony, assert that Local 10 advised them to obtain evidence of other Edsal employees' solicitation activity, but "intentionally avoided" gathering and presenting evidence that native-born workers disrupted the workplace.  (*Id.* ¶¶ 110, 118.)  Defendant moves to strike this assertion as an improper statement of fact and as unsupported by the evidence.  (Def.'s 56.1 Mem. ¶¶ 23, 25.)  The court notes that Plaintiffs' assertion is actually comprised of several different assertions, including that Local 10 did not gather evidence of other employees' disruption, that it did not present such evidence at the arbitration hearing, that it did not address disparate treatment for native-born employees, and that it did so "intentionally."  Some of these assertions are adequately supported and some are not; the court thus addresses the relevant assertions separately.

To the extent that Plaintiffs seek to assert Defendant's intent, the court agrees with Defendant that the assertion must be stricken; it indeed is conclusory, and neither Lopez or Vasquez in their affidavits, nor Trevino in his deposition, testify to facts suggesting they possess personal knowledge of Local 10's intent or motivation.  To the extent Plaintiffs assert that they were told to obtain evidence of solicitation but not disruption, the assertion is, technically, supported: Lopez states in his affidavit that he "was told to bring witnesses and evidence of solicitation that went on regularly at Edsal," but that "the subject of disrupting work was never brought up by [Ward

or Rios] or anyone from the Union", (Lopez Aff. ¶ 4); and Vasquez similarly states that in the January 7, 2004 meeting, "Ward and Rios never asked us about evidence of examples of work disruption."[20]  (Vasquez Aff. ¶ 5.)

Plaintiffs' assertions rely, however, on the notion that solicitation and work disruption, in this context, are separate and distinct from one another.  (Pl.'s 56.1 Mem. Resp. ¶ 11 (asserting, without explanation or citation to record evidence or other authority, that "[t]here is here a fine distinction between evidence of work disruption and mere solicitations.").)  Indeed, Lopez and Vasquez go so far as to state in their affidavits that they were unaware that they had been charged with work disruption, and were under the impression that they had been terminated only for solicitation. (Lopez Aff. ¶¶ 4, 8; Vasquez Aff. ¶ 6.)  As noted, this is wholly implausible insofar as their suspension notices accuse them of "disrupting the workforce," (*e.g.*, Employee Warning for Mark Vasquez), and their termination notices state that they were discharged for "causing disruption in the work place."  (*E.g.*, Termination Notice for Jose Lopez.)  Moreover, in his NLRB affidavit, Vasquez states that he was told when he was suspended that it was for "disrupting the workforce." (NLRB Vasquez Aff., at 2-3.)

More importantly, the record contains no evidence to support a characterization that solicitation and disruption constituted two separate and distinct charges; rather, the evidence shows that Plaintiffs, Local 10, Edsal, and Arbitrator Smith were all under the impression that Plaintiffs' circulation of UE petitions *was* the alleged work disruption, and that evidence of other employees' solicitation constituted evidence also of those employees' work disruption.  Plaintiffs' termination

_____

[20]      Plaintiffs' citation to Trevino's testimony is unhelpful, however, as Trevino merely answered "no" when asked if he could recall whether the union presented evidence of other solicitation and work disruptions at the arbitration hearing.  (Trevino Dep., at 159.)

The court notes that Plaintiffs' assertion that they "were told" to bring evidence of other solicitations is somewhat at odds with their assertion that they never met with Ward or Rios before December 4, 2003 to prepare for the arbitration.  It is possible that they received these instructions at the January 7 meeting before the second day of the hearing; this seems unlikely, however, as Ward in fact cross-examined Edsal's witnesses on December 4 with respect to other solicitations.

notices state that Edsal had notified employees that violation of the rule against solicitation "which interferes with production" would result in discipline, and that Plaintiffs had repeatedly violated that rule, thus "causing disruption in the work place." (*E.g.*, Termination Notice for Jose Lopez.) Arbitrator Smith states in his affidavit that Local 10 had attempted to solicit evidence at the arbitration hearing concerning "sales and *solicitations causing workplace disruption.*" (Smith Aff. ¶ 13 (emphasis added).) Most significantly, Defendant asserts in its LR 56.1 statement, and Plaintiffs admit, that Plaintiffs were suspended and then discharged for "disrupting the workplace *by soliciting.*" (Def.'s 56.1 ¶¶ 24, 34 (emphasis added); Pl.'s 56.1 Resp. ¶ 24 (admitting Defendant's assertion "with the exception" that Lopez was allegedly unaware of a disruption charge); Pl.'s 56.1 Resp. ¶¶ 25-39 (admitting those paragraphs in Defendant's LR 56.1 statement).) Plaintiffs' attempt to characterize solicitation as wholly separate and distinct from any workplace disruption charge thus finds no support in the record and runs counter to their own binding admissions.

To the extent Plaintiffs assert that Local 10 presented evidence of other employees' violation of the non-solicitation rule, but failed to present evidence of other employees' workplace disruptions, Plaintiffs' assertion is therefore unsupported. Plaintiffs' further assertion that Arbitrator Smith "found that Local 10 offered no evidence that other solicitations disrupted work at Edsal," (Pl.'s 56.1 Resp. ¶ 111), is unsupported as well, as Smith made no such finding. In the portion of his decision cited by Plaintiffs, Smith in fact notes that Local 10 "argue[d] that solicitations . . . are allowed and commonplace" and further argued that the grievants "were *no more disruptive*" than other employees engaged in such solicitation. (Arbitration Decision, at 28 (emphasis added).) Moreover, as noted, Smith states in his affidavit that when presenting the grievants' case on the hearing's second day, Local 10 "attempted to adduce evidence about sales and solicitations causing workplace disruption." (Smith Aff. ¶ 13.) In short, by presenting evidence of other employees' solicitation, Local 10 presented evidence of those employees' workplace disruption.

Plaintiffs assert more specifically, however, that Defendant failed to gather or present evidence that other, *native-born* employees in particular engaged in solicitation or disrupted the workplace. The record in fact contains no evidence that Local 10 elicited any testimony or introduced any evidence at the arbitration hearing regarding the national origin of the other employees that it argued had solicited like the grievants. In fact, Smith explicitly noted in his written decision that Local 10, while arguing that solicitation was commonplace at Edsal, had "stopped short however of charging disparate treatments which to do so would shift the burden to the Grievants." (Arbitration Decision, at 28.)

According to Plaintiffs, such disparate treatment evidence existed. Specifically, Plaintiffs assert that African-American employee Everett James "regularly disrupted work at Edsal by making solicitations out of the safety equipment department." (Pl.'s 56.1 ¶ 112.) This alleged solicitation was disruptive, according to Plaintiffs, because it forced employees to wait to obtain equipment, resulting in their returning late to their work stations. (*Id.*) Plaintiffs further assert that the situation "was well known by Defendant and Edsal." (*Id.*) Plaintiffs cite to the affidavits of Lopez and Vasquez in support of these assertions.[21] Lopez, without identifying James, states the following:

> An African American, native born black worker . . . sold candy, flowers, toys and other items, not related to work, out of the protective equipment department. Mexican workers who didn't buy his things are made to wait and as a result got into trouble with supervisors for being away from work too long, while black workers who bought his things received immediate attention, got their protective equipment (gloves, glasses, hard hats) and returned quickly to work. . . . [T]hat work disruption occurred regularly and was never stopped by Edsal. . . . Local 10 did not want to disturb the situation of disrupting work at the protective equipment room because it involved a native born American worker.

(Lopez Aff. ¶ 8.) Vasquez describes a similar practice, identifies the "black worker" as James,

---

[21] Plaintiffs also cite to the affidavit of Alicia Cisneros, which the court has stricken as discussed above. Her affidavit largely repeats allegations made by Lopez and Vasquez; her additional allegations that James told her that Mexican workers would have to buy his products to get faster service for safely gloves, and that other Mexican employees had complained to Rios about James, would appear to be inadmissible in any event as hearsay and/or for lack of personal knowledge. (Cisneros Aff. ¶ 6.)

states that "[a]ll the supervisors knew about this but did nothing about it," and uses precisely the same language in his affidavit as Lopez: "Mexican workers who didn't buy his things are made to wait and as a result got into trouble . . . (etc.)." (Vasquez Aff. ¶ 7.) Vasquez further asserts that "Local 10 did not want to disturb Everett James' situation because it involved a native born worker," and speculates that "my guess is he split his profits with Union officials." (*Id.* ¶ 8.) Both affiants assert that this evidence "would have made a big difference at the Arbitration." (*Id.*; Lopez Aff. ¶ 8.)

Local 10 moves to strike these statements in Lopez's and Vasquez's affidavits as speculative, conclusory, not based on personal knowledge, and otherwise lacking foundation. (Def.'s Aff. Mem., at 5-8; Def.'s 56.1 Mem. ¶ 27.) The court largely agrees with these arguments, to which Plaintiffs fail to respond.[22] Although James' status as "native born" is, contrary to Defendant's argument, likely within the affiants' personal knowledge, Lopez's and Vasquez's conclusory and speculative allegations that Local 10 "did not want to disturb" James' sales because James is native-born must be stricken, as the record contains no evidence that either affiant was privy to what Local 10 knew, nor to Local 10's intent or motivation. *See* FED. R. CIV. P. 56(e); FED. R. EVID. 602. Vasquez's blatant speculation of profit-sharing between Local 10 and James is improper as well. *See Pfeil*, 757 F.2d at 862 (striking conclusory statements in affidavits consisting of "nothing more than unsupported suspicion and argumentation without foundation in the record"); *see also Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991) ("inferences and opinions must be grounded in observation or other first-hand personal experience. They must not be flights of fancy, speculations, hunches, intuitions, or rumors about matters remote from that

---

[22] Plaintiffs' counsel states the following: "It would be waste [sic] of this Court's time read [sic] Plaintiffs' re-quotation here of the paragraphs addressed by the motions [sic] uneven attack." (Pl.'s Aff. Mem. Resp., at 5.) The court finds this sentence incomprehensible. Counsel does not specifically respond to Defendant's motion to strike the paragraph in Plaintiffs' LR 56.1 statement that contains the assertions relating to James, either; rather, Plaintiffs' counsel notes that paragraph in a list of paragraphs that Defendant contends are based on improper affidavit testimony, and states merely that "Plaintiff [sic] disagrees." (Pl.'s 56.1 Mem. Resp. ¶ 8.)

experience."). And neither affiant has demonstrated any basis for offering a legal opinion as to the effect that evidence of James' solicitation would have had, had it been squarely presented at the arbitration hearing. *See Pfeil*, 757 F.2d at 862 ("expression of legal opinion" not "recitation of a 'fact'" to which affiant competent to testify).

The court overrules Defendant's objections, however, with respect to Lopez's and Vasquez's assertions that James was engaged in sales activities; that these activities were disruptive because the caused workers to wait longer for their equipment;and that Mexican workers in particular who did not buy from James were made to wait longer than black workers who did buy James' merchandise. Both affiants state in their affidavits: "I heard and saw these things repeatedly at Edsal." (Lopez Aff. ¶ 8; Vasquez Aff. ¶ 7.) Moreover, their assertions are not as entirely lacking in specifics as Defendant urges, as Lopez and/or Vasquez name the types of items James was allegedly selling (candy, toys, flowers, clothing), and describe the kinds of equipment James was responsible for passing out (gloves, hard hats, glasses, earplugs, respirators). (Lopez Aff. ¶ 8; Vasquez Aff. ¶ 7.) Vasquez further states that James "stood behind a counter," and that "a wire gate swung down over the counter and could be locked and there were cabinets in the room where he stored his wares." (Vasquez Aff. ¶¶ 7-8.) The affidavits thus sufficiently establish that Lopez and Vasquez were in a position to personally observe James' alleged activities, their effect on workers, and whether James treated Mexican workers differently from his black customers.[23]

---

[23] In contrast, Vasquez's additional assertions that unspecified "black workers" were "disruptive on a regular basis" by "taking long breaks, smoking on the job, going to the bathroom for a long time, but never getting verbally disciplined for it whereas this happened regularly with the Mexican workers," (Vasquez Aff. ¶ 6), are entirely lacking in specifics. "Rule 56 demands something more specific than the bald assertion of the general truth of a particular matter, rather it requires affidavits that cite specific concrete facts establishing the existence of the truth of the matter asserted." *Drake v. Minnesota Min. & Mfg. Co.*, 134 F.3d 878, 887 (7th Cir. 1998) (internal quotations and citations omitted) (disregarding "conclusory allegations" that "every time" black worker complained to human resources director about problems with a white employee, director "would never conduct an investigation or take any action against that white employee"). Vasquez's vague allegations concerning the alleged disruptive behavior of black workers are thus stricken.

For purposes of this decision, the court will also credit Plaintiffs' assertion that Edsal and/or its supervisors knew about James' activities. Although statements such as Vasquez's claim that "[a]ll the supervisors knew about this," (Vasquez Aff. ¶ 7), appear to lack foundation, it is possible that when workers "got into trouble with supervisors for being away from work too long" while waiting for James to complete his sales, (id.), those workers explained why they were late. If so, the supervisors, and therefore possibly Edsal, knew what James was doing.

The court thus strikes paragraph 112 of Plaintiffs' LR 56.1 statement of additional facts only insofar as it asserts Local 10's knowledge of James' alleged solicitation activities.

## 2. Local 10's Alleged Racial Animus

Plaintiffs assert that Local 10 "harbored racial animus against its members of Mexican national origin." (Pl.'s 56.1 ¶ 116.) The court strikes this allegation as an improper argumentative conclusion, rather than a factual assertion. *See* N.D. Ill. R. 56.1. In support of their allegation, however, Plaintiffs rely on at least some admissible evidence: first, Plaintiffs cite statements made by former CSJB Business Agent and Local 10 President[24] Horatio Vasquez on two occasions: a Local 10 meeting on May 10, 2003, shortly before Plaintiffs were suspended on May 13, 2003; and a confrontation[25] between Horatio Vasquez and Plaintiff outside the Edsal plant on May 14, 2003. (Pl.'s 56.1 Resp. ¶ 116.) Second, Plaintiffs allege that Local 10 showed a "pattern of favoritism" towards native-born workers, as evidenced by an alleged failure to act on Mexican workers' complaints. (*Id.* at 117.) The court addresses these assertions in turn.

---

[24]     Plaintiffs identify Horatio Vasquez only as "a Local 10 official." (Pl.'s 56.1 ¶ 115.) Evidence attached to Defendant's LR 56.1 materials reveals that he was a CSJB Business Agent and the "President of Production Workers Union, Local No. 10, AFL-CIO", (Grievance Committee Decision, Ex. 57 to Def.'s 56.1), until, as will be noted, he was removed from both positions.
     Horatio Vasquez's national origin has not been established. The affidavit of Alicia Cisneros, which the court has stricken, states, without providing any basis for this knowledge, that Vasquez "is of United States and Puerto Rican national origin." (Cisneros Aff. ¶ 3.)

[25]     Plaintiffs object to Defendant's description of the incident as an "altercation." (Pl.'s 56.1 Resp. ¶ 75.) The court uses either "incident" or "confrontation" to describe the event.

### a.      Horacio Vasquez

Plaintiffs assert that at a Local 10 union meeting on May 10, 2003, Horatio Vasquez stated "that he was going to fire Plaintiffs and Jose Trevino because they were supporting the rival union." (Pl.'s 56.1 ¶ 115.)  Plaintiffs rely on the affidavit of Ernesto Garduno,[26] which contains no allegations but merely authenticates Garduno's NLRB affidavit, which was sworn to on June 23, 2003.  (E. Garduno Aff. ¶ 2.)  In the NLRB affidavit, Garduno stated that he drove two relatives, both Edsal employees, to a Local 10 meeting at a hotel near downtown Chicago.  (NLRB Garduno Aff., Ex. 5 to Pl.'s 56.1, at 1.)  When Garduno arrived, "someone named Horatio" was speaking to a group of thirty to forty employees, in English, while "another guy [was] walking around translating in Spanish" for those, like Garduno, who did not speak English.  (*Id.*)  According to Garduno, the speaker "said that Oscar and Mark and Jose and another Jose, he mentioned their last names but I don't remember[] them, were going to be fired" and that "he was going to fire them" for "running around gathering signatures and rallying up the people for another union."  (*Id.*)

Defendant, citing to Rios' supplemental affidavit, denies these comments were made. (Def.'s 56.1 Reply ¶ 115.)  In that affidavit, Rios states that he was present at the May 10 meeting, and that Horatio Vasquez "never said, in English or Spanish that he was going to get Oscar Trapaga, Mark Vasquez, Jose Lopez and/or Jose Trevino fired from the company."  (Rios Supp. Aff. ¶ 3.)  The court concludes there is a factual dispute as to whether Horatio Vasquez indeed made such comments, which must be resolved in favor of Plaintiffs for purposes of this motion.

The May 14 confrontation[27] between Trapaga and Horatio Vasquez offers more explicit, and

---

[26]      Plaintiffs also cite to the affidavit of Matiana Garduno, who identifies herself as Ernesto's wife, which the court has stricken.  Her affidavit contains no allegations not also made in her husband's affidavit.

[27]      Defendant asserts, and Plaintiffs admit, that the incident occurred on May 14.  (Def.'s 56.1 ¶ 75; Pl.'s 56.1 Resp. ¶ 75.)  In their NLRB affidavits, however, Cisneros, Trapaga and Mark Vasquez indicate that it occurred on May 15.  The difference is immaterial, and for purposes of this
(continued...)

largely undisputed, evidence of bigotry on the part of Horatio Vasquez. On that day, a hearing was scheduled at the Edsal plant on the grievances filed by Trapaga, Lopez, and Trevino over their May 13 suspensions. (NLRB Trapaga Aff., at 5; NLRB Vasquez Aff., at 3.) According to Edsal employee Cisneros, who was standing outside the plant with Trapaga, a UE representative, and "Jose" and "Mark"—presumably either Lopez or Trevino, and Plaintiff Vasquez—Horatio Vasquez came out of the plant, walked towards Trapaga "in a very menacing manner," made several threatening comments in Spanish, called Trapaga a "son of a bitch," and then "charged" Trapaga; others intervened to "stop [Vasquez] from beating up" Trapaga. (NLRB Cisneros Aff., at 2-3.) Cisneros further stated, in her NLRB affidavit, that "[a]ll the while [Horacio Vasquez] was saying stupid Mexicans you don't know what you are doing." (*Id.* at 3.)

After learning of this incident, CSJB President Mark Spano began an investigation in which Spano obtained statements from Plaintiffs Vasquez and Trapaga. (Def.'s 56.1 ¶¶ 78-79.) In his statement describing the confrontation, Mark Vasquez reported that Horacio Vasquez agreed that he had to represent Trevino, Mark Vasquez and Lopez in their grievances, but "not that piece of shit," pointing at Trapaga; Horacio Vasquez then "trie[d] to grab" Trapaga. (*Id.* ¶¶ 80-81; Vasquez Statement, Ex. 55 to Def.'s 56.1.) Mark Vasquez's statement contains no mention of Horacio Vasquez referring to "Mexicans." Trapaga, in his statement, reported that Horacio Vasquez accused him of being a "ringleader" of the UE organizing effort, tried to grab his neck, and told him "Fucking Mexicans don't know what they're doing, stupid Mexican motherfuckers." (Def.'s 56.1 ¶ 81; Trapaga Statement, Ex. 56 to Def.'s 56.1.) Defendant does not, in its LR 56.1 materials, dispute that Horatio Vasquez uttered these derogatory remarks.[28]

---

[27](...continued)
motion, the court accepts the former date as undisputed. *See* N.D. Ill. R. 56.1(a).

[28]    In its reply brief, Defendant points out that Plaintiffs have not actually asserted in their LR 56.1 materials that Horacio Vasquez used the words "stupid Mexican motherfuckers" and
(continued...)

Trapaga also reported in his statement that Local 10 representative Woodard met with him, Lopez and Trevino on May 14, 2003 at Local 10's offices. (Def.'s 56.1 ¶ 82.) At this meeting, Woodard, in Lopez's and Trevino's presence, repeatedly apologized to Trapaga for Horacio Vasquez's statements and conduct in connection with the incident outside the Edsal plant. (*Id.* ¶ 83.) It is undisputed that after May 14, 2003, Horacio Vasquez was barred from representing Plaintiffs and Trevino in their grievances against Edsal; from that point on, Woodard and Rios represented the employees. (*Id.* ¶¶ 29-30.)

On August 4, 2003, the CSJB terminated Horacio Vasquez from his position as Business Agent, in part because of his conduct toward Trapaga on May 14, 2003. (*Id.* ¶ 86.) Horacio Vasquez filed a grievance challenging his termination. (*Id.* ¶ 87.) Trapaga and Mark Vasquez both testified about the incident at a hearing on that grievance held on October 21, 2003. (*Id.* ¶ 88.) On November 4, 2003, a CJSB grievance arbitration panel upheld the discharge, based on several instances of misconduct including Horacio Vasquez's actions on May 14. (*Id.* ¶ 89.) The panel specifically noted Trapaga's claim that Horacio Vasquez had used the words "fucking Mexicans" and "stupid Mexican motherfuckers." (Grievance Committee Decision, at 9.) On November 7, 2003, Spano filed internal union disciplinary charges with Local 10 against Horacio Vasquez, alleging several violations of the AFL-CIO constitution. (Def.'s 56.1 ¶ 90.) The Executive Board

---

[28](...continued)
"fucking Mexicans," nor cited to evidence supporting any such assertion; rather, Plaintiffs assert that Vasquez used "slurs" and cite to Defendant's own LR 56.1 statement, which does contain this language. (Defendant's Reply Memorandum in Support of Its Motion for Summary Judgment ("Def.'s Reply"), at 12-13.) Defendant attempts to minimize its own assertion by contending that it only asserted that Trapaga *reported* that Horacio Vasquez used that language; according to Defendant, this "does not establish that [the slurs] were in fact made." (*Id.* at 13.) The court does not find this technical distinction as significant as does Defendant. In any event, Defendant at no point asserts that the slurs were *not* made, nor provides any evidence to counter Trapaga's report.

The court notes, however, that in his NLRB affidavit, Trapaga stated that Horacio Vasquez called him, Lopez and Trevino "motherfuckers"; Trapaga made no reference to national origin. (NLRB Trapaga Aff., at 5.) Nor does Trapaga assert that Vasquez tried to grab his neck; rather, he states that Vasquez "got in my face," but that he "kept moving away because I did not want to fight him." (*Id.*)

of Local 10 removed Horacio Vasquez as Local 10's President on November 25, 2003, in part because of his conduct towards Trapaga on May 14, 2003. (*Id.* ¶ 91.)  The Board's written decision noted the alleged derogatory remarks.  (Executive Board Decision, Ex. 59 to Def.'s 56.1, at 6.)

### b.    Local 10's Alleged Disparate Treatment

In addition to presenting Horacio Vasquez's comments as evidence of Local 10's alleged racial animus, Plaintiffs further assert that Defendant demonstrated a "pattern of disparate treatment" and "favoritism toward native-born Local 10 members against its Mexican members with respect to grievances and work conditions," and that Local 10 "refused to file grievances sought by Mexican workers such [as] Jose Trevino."  (Pl.'s 56.1 Resp. ¶¶ 116-17.)  Defendant moves to strike these assertions, which Plaintiffs support by citing to Lopez's and Mark Vasquez's allegations in their affidavits regarding James, (Lopez Aff. ¶¶ 7-9; Vasquez Aff. ¶¶ 6-8), and to Trevino's deposition testimony.[29]  (Trevino Dep., at 8-48.)  As Plaintiffs fail to present any evidence that Local 10 was aware of James' activities, much less condoned them, Lopez's and Mark Vasquez's affidavits provide no support for Plaintiffs' assertion that Local 10 favored native-born members such as James.  The court thus looks to Trevino's testimony for support of Plaintiffs' assertions.

Unfortunately, Plaintiffs simply cite, without pinpoints or any more specific assertions, to forty pages of Trevino's deposition transcript.  (Pl.'s 56.1 Resp. ¶ 117.)  In its own review of this material (an endeavor not anticipated by this court's rules), the court notes that Trevino testified regarding specific instances in which Local 10 officials did not act on his complaints, and further related more general allegations of favoritism shown by Edsal towards unidentified black workers.  With respect to the former, Trevino testified that he once complained to Local 10 union steward Juan Arbello that

---

[29]    Plaintiffs also cite to the affidavits of Trapaga and several other employees, which the court has stricken.  The court notes that these affidavits, for the most part, relate incidents in which Edsal allegedly showed favoritism towards black employees.  Some of the affidavits further allege that Local 10 did not act on complaints of favoritism, or refused to file grievances when Hispanic members complained about black members.  Most, however, describe incidents involving other people, rather than the affiants themselves.

an Edsal foreman spoke to Trevino about taking too long in the bathroom, but did not do the same to black workers. (Trevino Dep., at 9-10.) According to Trevino, Arbello promised to speak to the foreman, and although Trevino stated that Arbello did not do so, Trevino answered "no" when asked if "the difference in treatment" between Trevino and black workers continued after that. (*Id.* at 10.) Trevino also testified that in 2005, after being given two warnings for "leaving [his] place" and "attack[ing] verbally to a steward," he complained to Rios, and that Rios promised to "take care of the matter" but "never came and gave me an answer." (*Id.* at 13-14.) In another incident that occurred before he was "off for a year" (presumably from his May 2003 suspension to his June 2004 reinstatement), Trevino testified that while stacking metal next to a machine operated by a black female employee, a supervisor ordered him to feed material into the machine; Trevino refused because "that was the operator's job." (*Id.* at 15-16, 21-22.) After the supervisor told him to either do the work or go home, Trevino left and "went to my working area" to wait to see what action the supervisor would take. (*Id.* at 19.) The supervisor "didn't say or do nothing." (*Id.*) Nonetheless, Trevino complained about the incident to CJSB President Spano, who told him that Rios would investigate. (*Id.* at 20-21.) When Trevino called Rios fifteen days later, Rios allegedly told him that because he had not come to Rios directly, Rios "didn't have nothing for" Trevino. (*Id.* at 21.) Trevino also testified about an incident in 2002, when he was a union steward, in which he tried to file a grievance on behalf of a co-worker named Cosme Anguiano, whose race or national origin Trevino does not identify. (*Id.* at 26.) According to Trevino, then-Local 10 President Horacio Vasquez refused to acknowledge Trevino's status as a steward and told him he could not file the grievance; Vasquez then allegedly called Trevino a "fucking Mexican." (*Id.* at 28, 30.) Trevino complained of this to Rios approximately two weeks later, but received no response. (*Id.* at 33-34.)

In his more general allegations of favoritism shown to black workers at Edsal, Trevino testified that black workers, whom he does not identify, took naps but that "they never tell them nothing." (*Id.* at 10.) He also testified that an unidentified black woman was once given an "easy

job" while a pregnant woman, whose race or national origin Trevino does not identify, was doing "hard work"; Trevino related hearsay statements from an unidentified declarant to the effect that the black woman received the easier assignment because she was black. (*Id.* at 15.) Trevino further testified that a physical altercation between two female workers, one black and the other Hispanic, which had resulted in both workers' termination and then reinstatement, was "discriminatory" because a black supervisor had spoken in favor of the black worker. (*Id.* at 35-37.) Trevino related other hearsay statements in which he overheard a black supervisor referring to "fucking Mexicans making a lot of trouble." (*Id.* at 22-24.) According to Trevino, Rios "knew about what was happening" because Trevino had told President Spano (apparently when he complained about the machine-operating incident), along with four co-workers whom Trevino did not identify, that there was generally "discrimination against . . . Hispanics" at Edsal. (*Id.* at 24-25.)

### F. Trapaga's EEOC Charge

On September 23, 2003—well before the arbitration hearing—Plaintiff Trapaga filed a charge with the Illinois Department of Human Rights ("IDHR") and the Equal Employment Opportunity Commission ("EEOC"), asserting national origin discrimination by Local 10. (Def.'s 56.1 ¶ 92.) The charge alleged that because Trapaga is Mexican, Local 10 did not adequately represent him in the grievance he had filed following his suspension from Edsal. (*Id.* ¶ 93.) The IDHR investigated the charge and dismissed it on January 10, 2005 for lack of substantial evidence. (*Id.* ¶¶ 95-96.) In its Investigation Report, the IDHR summarized Trapaga's allegations, Local 10's responses, and the evidence in support of each. (*Id.* ¶ 97.) The IDHR found that Local 10 had processed Trapaga's May 14, 2003 grievance through the grievance procedure, and had arbitrated the grievance through a neutral arbitrator who concluded that Trapaga's discharge was for just cause. (*Id.* ¶ 99.) The IDHR further noted that Trapaga had rejected both of Edsal's settlement offers, (*id.* ¶ 100), and concluded that Trapaga had failed to show a nexus between his national origin and Local 10's alleged failure to represent him. (*Id.* ¶¶ 101.) On July 12, 2005, the EEOC

adopted those findings and dismissed Trapaga's EEOC charge. (*Id.* ¶ 102.)

Unlike Trapaga, neither Lopez nor Mark Vasquez ever filed an EEOC or IDHR charge against Local 10. (*Id.* ¶ 94.) Plaintiffs, however, assert that Vasquez and Lopez "accompanied" Trapaga to IDHR, where they were interviewed by a "Hector Sanchez" who allegedly "told [Vasquez and Lopez] that their complaints would be joined as one IDHR charge" with Trapaga's complaint. (Pl.'s 56.1 Resp. ¶ 113.) Plaintiffs further assert that Vasquez and Lopez "relied upon and believed their complaints were included" in Trapaga's charge. (*Id.* ¶ 114.) Plaintiffs cite only to their own affidavits, which state, identically, that Sanchez told them "very clearly that our complaints would be put all together because they would be stronger that way." (Lopez Aff. ¶ 10; Vasquez Aff. ¶ 10.) Attached to Vasquez's affidavit is a copy of Hector Sanchez's business card, which identifies him as an IDHR investigator and contains his address and telephone number.

It is undisputed that neither the IDHR charge nor the Investigation Report mention any allegation or evidence relating to discrimination against Lopez and Vasquez. (Def.'s 56.1 ¶ 98.)

## DISCUSSION

Trapaga, Lopez, and Mark Vasquez filed a *pro se* complaint on October 5, 2005, bringing claims under Title VII and 42 U.S.C. § 1981 and alleging discrimination on the basis of national origin. Plaintiffs contend that Local 10 discriminated against Plaintiffs by intentionally concealing and failing to present, at Plaintiffs' arbitration hearing, evidence of Edsal's "disparate enforcement of work rules and the favoritism toward native born workers." (Plaintiffs' Brief in Opposition to Summary Judgment ("Pl.'s Resp."), at 4.) Had Defendant presented such evidence, Plaintiffs maintain, the outcome of the arbitration would have been more favorable, and Plaintiffs would not have lost their jobs. (*Id.*) In its motion for summary judgment, Defendant argues that (1) Lopez and Vasquez cannot maintain Title VII claims because they, unlike Trapaga, never filed an EEOC charge before bringing suit; and (2) Trapaga cannot establish a prima facie case of discrimination against Local 10 under Title VII. (Def.'s Reply, at 1.) As explained in greater depth below, Local

10 is entitled to summary judgment on Plaintiffs' claims.

## I.     Summary Judgment Standard

Summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  The court construes the facts and draws all reasonable inferences in the light most favorable to the party opposing summary judgment.  *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).  The court is not, however, required to "'draw every conceivable inference from the record,'" and inferences supported only by speculation or conjecture will not defeat a summary judgment motion.  *Bell v. Duperrault*, 367 F.3d 703, 707 (7th Cir. 2004) (quoting *McCoy v. Harrison*, 341 F.3d 600, 604 (7th Cir. 2003)).  Moreover, the nonmoving party "must offer something more than a 'scintilla' of evidence to overcome summary judgment."  *Roger Whitmore's Auto. Servs., Inc. v. Lake County, Ill.*, 424 F.3d 659, 667 (7th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).  Rather, the evidence must be "'such that a reasonable jury could return a verdict for the nonmoving party.'" *Id.* (quoting *Anderson*, 477 U.S. at 248).

## II.     Lopez's and Vasquez's Failure to File an EEOC Charge

Defendant argues that neither Lopez nor Vasquez can maintain a Title VII claim because they never filed an EEOC charge.  As a general rule, a plaintiff may not bring a Title VII suit in federal court without first filing a timely complaint with the EEOC, detailing the alleged discriminatory conduct.  *Bennett v. Roberts*, 295 F.3d 687, 695 n.6 (7th Cir. 2002).  Trapaga filed such a charge, but Lopez and Vasquez did not.  Plaintiffs assert, however, that Lopez and Vasquez accompanied Trapaga when he filed his charge, that IDHR investigator Sanchez told Lopez and Vasquez that their claims would be "joined as one" with Trapaga's charge because the charge would be "stronger that way," and that Lopez and Vasquez relied upon these alleged statements.

Contending that Lopez's and Vasquez's EEOC charges merely "fell through a bureaucratic crack" through no fault of their own, Plaintiffs urge the court to find that Lopez and Vasquez "constructively filed timely charges at IDHR under the doctrine of equitable tolling." (Pl.'s Resp., at 7-8.)

That doctrine allows the 180- or 300-day period for filing an EEOC charge to be tolled in the event of, for example, erroneous representations made by the EEOC. *See Early v. Bankers Life and Cas. Co.*, 959 F.2d 75, 78, 81 (7th Cir. 1992) (tolling appropriate to allow complaint to survive motion to dismiss where plaintiff alleged that he attempted to file EEOC charge, completed intake form and was told that by EEOC that he had taken necessary steps to preserve right to file suit, but later learned no charge was executed and served on defendant). "It is incumbent on [Planitiffs]," however, "to show that the fault lay with the EEOC" and not with them. *Salas v. Wis. Dep't of Corrs.*, 429 F. Supp. 2d 1056, 1074-75 (W.D. Wis. 2006) (rejecting plaintiff's equitable tolling argument where plaintiff asserted he had filed EEOC charge through a mailing, but neglected to present as evidence the letter he claimed to have sent).[30]

The court doubts the doctrine has any application here. None of the state or federal agency documents identify Lopez or Vasquz as complaining parties nor did they ever receive a right-to-sue letter. Plaintiffs' explanation for their continued reliance on Sanchez's alleged assurances—that they are "unsophisticated" and "barely literate"—is unpersuasive. (Pl.'s Resp., at 7.) Nonetheless, the court need not decide the issue: because Lopez and Vasquez also bring cognizable claims under § 1981, which does not require the filing of an EEOC charge, *see Walker v. Abbott Laboratories*, 340 F.3d 471, 474 (7th Cir. 2003), and which is governed by the same standards of liability as Title VII, *see Bennett*, 295 F.3d at 697, the court will reach the merits of their claims in any event. *See Bullard v. Sercon Corp.*, 846 F.2d 463, 469 (7th Cir. 1988) (because plaintiff brought § 1981 claim against union in addition to Title VII claim, analysis of EEOC exhaustion issue

---

[30]     *Salas* is, inexplicably, the only case Plaintiffs cite in support of their argument.

was "to some extent a matter merely of shadow-boxing"). As discussed below, the court concludes that Defendant is entitled to summary judgment on the merits of Plaintiffs' claims; Lopez's and Vasquez's failure to file an EEOC charge is thus moot.

### III.    Plaintiffs' Title VII Claims

In its provisions pertaining to a union's liability for discriminatory practices, Title VII makes it an "unlawful employment practice" for a labor organization "to exclude or to expel from its membership, or to otherwise discriminate against, any individual because of his race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(c)(1). It is further unlawful for a union "to cause or attempt to cause an employer to discriminate against an individual in violation of this section." 42 U.S.C. § 2000e-2(c)(3). Title VII does not, however, impose upon a union an affirmative duty to prevent racial harassment or other forms of discrimination in the workplace; that responsibility remains with the employer who controls the workplace and is in a better position to discipline offenders. *E.E.O.C. v. Pipefitters Ass'n Local Union 597*, 334 F.3d 656,660-61(7th Cir. 2003). Thus, Title VII applies to a union only in its role as the employees' agent, in bargaining and in implementing collective bargaining agreements. *Maalik v. Int'l Union of Elevator Constructors, Local 2*, 437 F.3d 650, 652 (7th Cir. 2006); *see Pipefitters*, 334 F.3d at 659 ("If [a union] discriminates in the performance of its agency function, it violates Title VII, but not otherwise.").

To establish a prima facie Title VII claim against a union, a plaintiff must show: (1) that the employer violated the collective bargaining agreement between the union and the employer with respect to the plaintiff; (2) that the union breached its own duty of fair representation by letting the breach go unrepaired; and (3) that some evidence indicates that the union's actions were motivated by a prohibited discriminatory animus. *Greenslade v. Chicago Sun-Times, Inc.*, 112 F.3d 853, 866 (7th Cir. 1997); *Johnson v. Artim Transp. Sys., Inc.*, 826 F.2d 538, 542 (7th Cir. 1987); *Bugg v. Int'l*

*Union of Allied Indus. Workers of Am., Local 507 AFL-CIO*, 674 F.2d 595, 598 n.5 (7th Cir.1982).[31]

The plaintiff must demonstrate each of the three elements by a preponderance of the evidence. *Greenslade*, 112 F.3d at 867. The court addresses each element in turn.

### A.    Edsal's Breach of the CBA

Defendant contends that Plaintiffs have failed to establish that Edsal violated the CBA because they have not demonstrated that Edsal discharged them without just cause. (Def.'s Reply, at 5.) Defendant points out that Arbitrator Smith concluded that Edsal had cause to discharge Plaintiffs for disrupting the workforce, and urges the court to defer to Smith's determination. (*Id.*) Plaintiffs do not respond to Defendant's argument; nor have Plaintiffs asserted, in either their LR 56.1 materials or response brief, that Plaintiffs did *not* disrupt the workforce or that Edsal in fact terminated them without just cause. Instead, Plaintiffs, citing a "typical anti-discrimination clause"

---

[31]      Plaintiffs apparently do not believe that the well-established *Greenslade* test is the applicable legal standard. Insisting that "this case is a Title VII and [§ 1981] national origin discrimination case," Plaintiffs label any reference to the duty of fair representation "superfluous," but are "happy to include breach of the duty of fair representation as another theory of liability." (Pl.'s Resp., at 4.) Plaintiffs "urge the direct method of proving the discrimination against them," and cite only to Title VII cases against employers discussing the difference between direct and circumstantial evidence. (*Id.*)

It is not evident, however, that the familiar scheme of "direct" and "indirect" methods of proving discrimination in suits against employers, applies in identical fashion to suits against unions. *See Bugg*, 674 F.2d at 598 n.5 (stating separate tests for establishing Title VII claims against union and employer). Indeed, Plaintiffs cite no cases employing the direct/indirect scheme where, as here, a union member claims the union failed to properly represent him because of a prohibited animus. Courts have held that the plaintiff necessarily must show a breach of the duty of fair representation to maintain such a claim. *See Martin v. Local 1513 and Dist. 118 of the Int'l Ass'n of Machinists and Aerospace Workers*, 859 F.2d 581, 584 (8th Cir. 1988) (noting that to establish Title VII claim against union, "it is axiomatic that . . . there must first be a finding that the [union] breached its duty of fair representation."); *Ross v. Communication Workers of Am., Local 110*, No. 91 CIV. 6367(LAP), 1995 WL 351462, at *6-8 (S.D.N.Y. June 9, 1995) (rejecting, after extensive discussion of case law including Seventh Circuit's three-prong test, plaintiff's argument that her claim against union was based "strictly" on Title VII and required no showing of union's breach of duty of fair representation). Nor is the court aware of any Seventh Circuit decision to the contrary. Because Plaintiffs offer argument as to each of the elements of the *Greenslade* test in any event, the court proceeds under that framework.

The court notes that in addition to neglecting to cite an applicable legal standard, Plaintiffs' counsel fails to cite even a single case in support of his argument that Local 10 violated Title VII.

in the CBA,[32] contend that Edsal breached that clause "by not enforcing the work disruption rule against its African-American employees, particularly the work disruption of Everett James." (Pl.'s Resp., at 5.)

Although Plaintiffs refer to African-American "employees," Plaintiffs in fact identify only one such employee,[33] James, who sold merchandise out of the safety equipment department and allegedly caused workers to return late to their work stations. Moreover, Plaintiffs do not develop their argument beyond the sentence quoted above.[34] If James disrupted the workforce as Plaintiffs claim, and if Edsal declined to discipline him, that fact, standing alone, will not satisfy the first element of the *Greenslade* test; Plaintiffs are required to show that Edsal breached the CBA with respect to Plaintiffs in particular. *See Bugg*, 674 F.2d at 598 n.5 (plaintiff in Title VII action against union must demonstrate that employer breached agreement "with respect to the plaintiff"). Presumably, Plaintiffs intend to argue that Edsal breached the anti-discrimination clause because it disciplined Mexican employees for being disruptive by circulating petitions, while it refused to discipline James, a native-born employee, for being disruptive by selling merchandise.

It is not clear that this is sufficient to establish "by a preponderance of the evidence," *see Greenslade*, 112 F.3d at 867, that Edsal breached the CBA. As noted, Plaintiffs have cited no cases and have presented no further argument in support of their position; case law interpreting

---

[32]     Art. XII of the CBA states in relevant part: "The Company and the Union agree that there shall continue to be no discrimination in the employment policies and practices of the Company against any person on account of race, creed, sex, color, national origin, religion or ancestry." (CBA art. XII § 6, Ex. 10 to Def.'s 56.1.)

[33]     As noted, the court disregards vague and conclusory allegations in Vasquez's affidavit that unidentified black Edsal employees were frequently disruptive by "taking long breaks, smoking on the job," and "going to the bathroom for a long time," but were not reprimanded to the same extent as Mexican workers. (Vasquez Aff. ¶ 6.) *See Drake*, 134 F.3d at 887.

[34]     Plaintiffs' brief cites "the work disruption of Everett James which will be discussed more fully below"; there is no further reference to James in the brief, however.

the first prong of the *Greenslade* test is sparse, however.[35]  In *Greenslade* itself, where a male sports editor at the Chicago Sun-Times filed Title VII sex discrimination claims against the Sun-Times for transferring him when a female co-worker complained about harassment, and against his union for failing to file a grievance, the court, considering the claim against the union, rejected the plaintiff's argument that the Sun-Times had violated a general non-discrimination clause. *Id.* at 866-67.  The court had already concluded, however, that the plaintiff stated no viable Title VII claim of discrimination against the Sun-Times, and noted that the collective bargaining agreement gave the paper the power to transfer an employee at will.  *Id.* at 867.  Here, in contrast, Plaintiffs did not bring a Title VII claim against Edsal, so there has been no similar determination that Edsal did not discriminate against Plaintiffs.  *Greenslade* thus offers little guidance as to whether Plaintiffs' assertions regarding James are sufficient to establish that Edsal breached the anti-discrimination clause, for purposes of stating a Title VII claim against Local 10.

For its part, Defendant responds merely by pointing out that this is the first time that Plaintiffs have ever argued that Edsal violated the anti-discrimination clause of the CBA.  (Def.'s Reply, at 6.)  Defendants cite to no authority of their own, however to support their position that Plaintiffs' new-found reliance on the anti-discrimination clause is inappropriate.

Given the lack of authority in this area, and the parties' failure to further develop their arguments, the court is reluctant to conclude that Plaintiffs have failed to make the required showing as a matter of law.  The court notes, moreover, that some courts outside this jurisdiction have questioned the necessity of requiring a Title VII plaintiff to demonstrate a breach of a CBA in a claim against a union.  *See Agosto v. Corr. Officers Benev. Ass'n*, 107 F. Supp. 2d 294, 304 (S.D.N.Y. 2000) (concluding that Title VII claim may lie where there is a breach of the duty of fair representation, for discriminatory reasons, outside context of a breach of a CBA).  The court is

---

[35]      In *Bugg*, the Seventh Circuit engaged in no analysis of any of the three elements, 674 F.2d at 598; and in *Johnson*, the court addressed only the third element, 826 F.2d at 542-43.

therefore willing to assume, for purposes of this decision, that Plaintiffs have sufficiently established that Edsal breached the CBA.

### B. Local 10's Breach of the Duty of Fair Representation

Assuming that Edsal violated the CBA, Plaintiffs must establish that Local 10 breached its duty of fair representation with respect to Plaintiffs. *See Greenslade*, 112 F.3d at 866. "A union breaches its duty of fair representation if its actions are either arbitrary, discriminatory, or in bad faith." *Garcia v. Zenith Elec. Corp.*, 58 F.3d 1171, 1176 (7th Cir. 1995) (quoting *Air Line Pilots v. O'Neill*, 499 U.S. 65, 67 (1991). Plaintiffs argue that Local 10 breached its duty by (1) "misleading Plaintiffs about what evidence was needed" by "direct[ing] them merely to bring in evidence of other 'solicitation,'" rather than work disruption; (2) failing to present evidence of other employees' work disruption at the arbitration hearing; and (3) failing to allege, at that hearing, that Edsal applied the work disruption rule differently with regard to native-born employees. (Pl.'s Resp., at 5-6.)

Most of these arguments rely, however, on factual assertions unsupported by the evidence. As explained earlier, the record does not support Plaintiffs' attempt to characterize "solicitation" and "work disruption" as wholly separate and distinct from one another: Plaintiffs admit that they were suspended and discharged for "disrupting the workplace by soliciting", (Pl.'s Resp. ¶¶ 24, 25-39); Arbitrator Smith states in his affidavit that Local 10 adduced evidence of "sales and solicitations causing workplace disruption," (Smith Aff. ¶ 13); and Smith's written decision notes that Local 10 argued that solicitation was rampant at Edsal but that Plaintiffs "were no more disruptive" than other employees engaged in solicitation activities. (Arbitration Decision, at 28.) Plaintiffs' contention that Local 10 presented evidence of solicitation but not work disruption is thus untenable.

Nor does the record support Plaintiffs' contention that Local 10 misled Plaintiffs about what kind of evidence was needed for the hearing. In their affidavits, Lopez and Vasquez claim that "if [they] had known" to bring evidence of work disruption, rather than just solicitation, they would have told attorney Ward about James. (Lopez Aff. ¶ 8; Vasquez Aff. ¶¶ 6-7.) But James' alleged

disruptive activities consisted precisely *of* solicitation. Indeed, Plaintiffs themselves assert that James "disrupted work at Edsal by making solicitations . . . ." (Pl.'s 56.1 Resp. ¶ 112.) Plaintiffs' assertion that they knew to bring evidence of solicitation, but failed to bring evidence of James' solicitation because they did not know to bring evidence of disruption, fails as well.

Moreover, it appears that Ward *did* present evidence of James' activities at the hearing: Cisneros testified about a "dark guy" selling shoes in the department where employees exchanged work gloves; Artunez testified that he bought chocolates from "the guy who hands out the gloves" and who also sold baskets, socks, and shoes; and Trapaga himself testified that he bought a basket from "the glove man," who he identified as "Albert." (Arbitration Decision, at 18-22.)

Local 10 acknowledges that it did not "take the additional step of showing that Edsal's tolerance of the disruption caused by the man in the glove department was due to Edsal's intentional discrimination on the basis of national origin." (Def.'s Reply, at 10.) Because Plaintiffs' other bases for arguing that Local 10 breached its duty are unsupported by the evidence, it is this decision, and this decision alone, that Plaintiffs must demonstrate was arbitrary, discriminatory, or in bad faith.[36]

The test for determining arbitrariness is "quite forgiving": Local 10's decision not to argue disparate treatment on the basis of national origin will be considered arbitrary "only if 'in light of the factual and legal landscape,'" the decision was "'so far outside a wide range of reasonableness as to be irrational.'" *Garcia*, 58 F.3d at 1176 (quoting *Air Line Pilots*, 499 U.S. at 67). This is an "'extremely deferential standard' that precludes the courts from 'substitut[ing] their judgment for that

---

[36]     Plaintiffs' additional argument that Local 10 breached its duty by failing to provide an interpreter at the hearing, (Pl.'s Resp., at 6), is groundless. Of the three Plaintiffs, only Lopez does not understand English. (Lopez Aff. ¶ 1.) Vasquez is fluent in English, and Trapaga's six-page NLRB affidavit is in English and contains no indication that it was translated. (NLRB Trapaga Aff., at 6.) Rios translated at least some testimony, and three Edsal witnesses and all Local 10's witnesses save Vasquez testified in Spanish. (Smith Aff. ¶¶ 8, 12.) Most importantly, none of the Plaintiffs ever asked for an interpreter, and Plaintiffs do not assert here that they were unable to comprehend any part of the proceedings due to a language barrier.

of the union, even if, with the benefit of hindsight, it appears that the union could have made a better call.'" *Neal v. Newspaper Holdings, Inc.,* 349 F.3d 363, 369 (7th Cir. 2003) (quoting *Ooley v. Schwitzer Div., Household Mfg. Inc.*, 961 F.2d 1293, 1302 (7th Cir. 1992)). Local 10 asserts that it chose to pursue a disparate treatment theory, but one not based on national origin: it argued that Plaintiffs' disruptions were no worse than those of other employees, and that "just cause demands that like offenses be treated similarly for disciplinary purposes." (Def.'s Reply, at 10.) According to Local 10, it did not specifically argue disparate treatment based on national origin because, as Arbitrator Smith noted, the burden of proving disparate treatment on that basis would have fallen on the union. (*Id.* at 10-11; Arbitration Decision, at 28.) Although Local 10's strategy was ultimately unsuccessful with respect to Plaintiffs because Smith did not find the testimony of Plaintiffs or Local 10's other witnesses credible regarding other sales and solicitations, Local 10 maintains that its strategy cannot be deemed irrational.

Under the generous standard for determining arbitrariness, the court agrees that there was nothing irrational or unreasonable about Local 10's decision to pursue what appears to be a viable theory, rather than one that would have shifted the burden of proof to Local 10. This is especially so in light of the fact that in this action, Plaintiffs have presented no competent evidence that any native-born employee (besides, possibly, James) may have been treated more favorably, and very little evidence that Edsal knew about James' activities. Disparate treatment on the basis of national origin thus may have been difficult for Local 10 to prove.

Furthermore, to demonstrate a breach of Local 10's duty of fair representation, Plaintiffs must establish that the outcome of the arbitration would have been different but for Local 10's decision not to present evidence of disparate treatment based on national origin. *See Garcia*, 58 F.3d at 1177 ("Failure to 'present favorable evidence during the grievance process may constitute a breach of duty only if that evidence probably would have brought about a different decision.'") (quoting *Black v. Ryder*, 15 F.3d 573, 585 (6th Cir. 1994)) (ellipses omitted). Plaintiffs offer no

argument or evidence in this regard beyond a bald assertion that "[t]here can be little question that . . . the Arbitration outcome would have been different." (Pl.'s Resp., at 5.) In the court's view, there is in fact a very large question about this matter. The strategy employed by Local 10 failed, as noted, because Smith found incredible the testimony concerning other employees' solicitation activity. There is no reason to think that such testimony would have gained more credibility if the witnesses had identified the alleged solicitors' national origins. That, combined with the shift of the burden of proof to Local 10, casts doubt on Plaintiffs' prediction of a more favorable outcome.

Plaintiffs do not respond to Local 10's argument that its decision not to argue national-origin disparate treatment at the hearing was not arbitrary. Plaintiffs contend, however, that Local 10's decision not to present such evidence was discriminatory and/or in bad faith. The Seventh Circuit has explained that unlike the objective standard for arbitrariness, the test for "[w]hether or not a union's actions are discriminatory or in bad faith calls for a subjective inquiry and requires proof that the union acted (or failed to act) due to an improper motive." *Neal*, 349 F.3d at 369. To this end, Plaintiffs highlight Horacio Vasquez's references to "fucking Mexicans" and "stupid Mexican motherfuckers." Plaintiffs further argue that Vasquez's alleged threat to fire Plaintiffs and Trevino on May 10, three days before their suspensions, supports an inference of collusion between Edsal and Local 10. Finally, Plaintiffs assert that Local 10 declined to present evidence of disparate treatment of native-born employees so as not to "upset its base of support among native born workers at the time a rival union was courting Mexicans to oust Defendant." (Pl.'s Resp., at 7.)

In the court's view, the inquiry into whether Local 10 breached its duty of fair representation by acting with discriminatory intent necessarily overlaps with the third prong of the *Greenslade* test, which requires a Title VII plaintiff to present evidence indicating that the union's actions were motivated by a prohibited animus. *Greenslade*, 112 F.3d at 866. The court will address arguments regarding Horacio Vasquez's remarks as part of its discussion of that third prong.

Plaintiffs' remaining arguments about collusion with Edsal and Local 10's alleged desire to

placate its native-born base both lack merit. Plaintiffs' support for its collusion argument relies entirely an on inference drawn from the fact that Horacio Vasquez allegedly threatened to fire Plaintiffs and Trevino on May 10, 2003, and Edsal suspended them on May 13. (Pl.'s Resp., at 7.) As Defendant points out, however, Plaintiffs have offered no evidence that Vasquez was involved with Edsal's decision to suspend Plaintiffs, nor that he was even in a position to effectuate or even influence Edsal's decision. Moreover, any inference that can be drawn purely on the basis of timing is countered by the fact that Plaintiffs admittedly began the solicitation for which they were suspended, i.e., their circulating UE organizing petitions, on May 12—after Vasquez's alleged threat. (NLRB Trapaga Aff., at 3-4; NLRB Lopez Aff., at 1-2; NLRB Vasquez Aff., at 2.) Plaintiffs have thus failed to create a triable issue of fact as to whether Local 10 colluded with Edsal.

Similarly, Plaintiffs' allegation that Local 10 deliberately refrained from presenting evidence that Edsal 10 treated native-born workers more favorably, to avoid alienating its base of such workers while it attempted to stave off the UE organizing drive, is purely speculative. The record contains no evidence whatsoever that Local 10 even has such a "base"; Local 10's ethnic makeup is unknown here. Even if it is true that the UE was attempting to recruit Mexican workers, moreover, it is at least as possible that Local 10 would want to counter that effort by doing everything in its power to demonstrate to those workers that it was on their side.

The court concludes that Plaintiffs have failed to demonstrate that Local 10's decision not to present evidence, at Plaintiffs' arbitration hearing, that Edsal engaged in disparate treatment based on national origin, was arbitrary or in bad faith.[37] Unless Local 10 acted with discriminatory

---

[37] Despite Plaintiffs' vehement assertions in their LR 56.1 materials that Ward and Rios never met with them before the first day of the arbitration, Plaintiffs do not argue in their response brief that Local 10 breached its duty of fair representation on this basis. Such an argument would be unsuccessful in any event. In handling grievances, a union does not breach its duty so long as it has performed "some minimal investigation of the employee grievance," the thoroughness of which "depends on the particular case." *Garcia*, 58 F.3d at 1176 (citation and internal quotation marks omitted). Even if Plaintiffs are correct that no meetings occurred before Edsal presented its
(continued...)

intent, Local 10 did not breach its duty of fair representation and Plaintiffs' Title VII claim necessarily fails. The court turns, then, to that issue.

## C. Discriminatory Intent

Plaintiffs claim to have presented both direct and circumstantial evidence that Local 10 acted with discriminatory intent. "'Direct evidence is evidence which, if believed by the trier of fact, will prove the particular fact in question without reliance upon inference or presumption.'" *Rudin v. Lincoln Land Cmty. Coll.*, 420 F.3d 712, 720 (7th Cir. 2005) (quoting *Eiland v. Trinity Hosp.*, 150 F.3d 747, 751 (7th Cir. 1998)). Circumstantial evidence requires a plaintiff to construct a "'convincing mosaic'" of such evidence that "'allows a jury to infer intentional discrimination by the decisionmaker.'" *Rhodes v. Ill. Dept. of Transp.*, 359 F.3d 498, 504 (7th Cir. 2004) (citing *Troupe v. May Dept. Stores Co.*, 20 F.3d 734, 737 (7th Cir. 1994)). As direct evidence, Plaintiffs offer, as noted, Horacio Vasquez's references to "fucking Mexicans" and "stupid Mexican motherfuckers" during his confrontation with Trapaga outside the Edsal plant on May 14, 2003. As circumstantial evidence, Plaintiffs point to what they call a "pattern of favoritism" towards native-born union members, as evidenced by Local 10's alleged failure to act on Mexican workers' complaints and its decision not to present evidence of disparate treatment based on national origin during Plaintiffs' arbitration hearing. (Pl.'s Resp., at 3-4.) The court considers each here.

### 1. Horacio Vasquez's Derogatory References to Mexicans

There is no question that Horacio Vasquez's alleged choice of language during his confrontation with Trapaga would constitute compelling evidence that he was prejudiced against

---

[37](...continued)
case in chief on December 4, 2003, Ward must have investigated Plaintiffs' grievances at least minimally, as he cross-examined Edsal's witnesses with regard to other solicitations and work disruptions. It is undisputed, moreover, that Ward met with Plaintiffs and Trevino two days before they testified on the second day of the hearing in January 2004. This level of preparation likely satisfies the "minimal investigation" standard. *See id.* (no breach where union hired private attorney who first met with plaintiff the morning of the arbitration hearing).

Mexicans. Given that he was Local 10's President, this evidence might be sufficient to establish that as of May 14, 2003, Local 10 harbored a prohibited discriminatory animus. Plaintiffs' claims are not, however, based upon what happened on May 14; rather, they claim that Local 10, for discriminatory reasons, improperly represented them throughout the grievance process, all of which took place after May 14. As explained above, most of Plaintiffs' allegations in that regard are entirely unsupported by the evidence. The only action taken by Local 10 that remains at issue is its decision not to present, at Plaintiffs' arbitration hearing, evidence of disparate treatment based on national origin. It is that decision that Plaintiffs must show was based on a prohibited animus.

Direct evidence of discriminatory intent "essentially requires an admission by the decision-maker that his actions were based on the prohibited animus." *Radue v. Kimberly-Clark Corp.,* 219 F.3d 612, 616 (7th Cir. 2000) (citations omitted). Derogatory statements made by someone not involved in making the challenged decision do not constitute evidence that the decision was discriminatory. *Rozskowiak v. Village of Arlington Heights*, 415 F.3d 608, 612 (7th Cir. 2005) (citing *Gorence v. Eagle Food Ctrs., Inc.*, 242 F.3d 759, 762 (7th Cir. 2001)). Similarly, such remarks constitute circumstantial evidence, possibly giving rise to an inference of discrimination, only where "made by the decision maker, around the time of the decision, and in reference to" that decision. *Hemsworth v. Quotesmith.Com, Inc.*, 476 F.3d 487, 491 (7th Cir. 2007). Thus, "bigotry, *per se*, is not actionable. . . . [T]here must be a real link between the bigotry" and the alleged injury to the plaintiff. *Gorence*, 242 F.3d at 762 (citing *Miller v. Am. Family Mut. Ins. Co.*, 203 F.3d 997 (7th Cir. 2000)).

Horacio Vasquez's alleged profane and derogatory references to Mexicans, however offensive, do not constitute an admission that Local 10 failed to properly represent Plaintiffs because they are Mexican. More importantly, Plaintiffs have shown no connection between Horacio Vasquez's bigotry and Local 10's arbitration strategy. It is undisputed that from the time he uttered those remarks in the confrontation with Trapaga outside the Edsal plant on May 14, 2003, Horacio

52

Vasquez had nothing to do with Plaintiffs' grievances, and indeed was barred from representing Plaintiffs and Trevino. (Def.'s 56.1 ¶¶ 29-30.) In fact, in part because of Vasquez's comments and actions with respect to Trapaga, the CSJB terminated Horacio Vasquez from his position as Business Agent on August 4, 2003, and Local 10 removed him as President on November 25, 2003. (*Id.* ¶¶ 86, 91.) By the time of the first day of the arbitration hearing on December 4, 2003, Vasquez was completely out of the picture; the record contains no evidence to suggest that he influenced, in any way, Local 10's decision not to present evidence of national-origin disparate treatment at the arbitration hearing. He was thus not a relevant "decision maker," and his derogatory remarks neither referred to the decision at issue nor were made anywhere near the time of the decision. Those remarks thus constitute neither direct nor circumstantial evidence of Local 10's discriminatory intent.

Similarly, Horacio Vasquez's alleged threat, on May 10, that he would fire Plaintiffs and Trevino, does not demonstrate a prohibited animus with regard to Local 10's arbitration strategy. On its face, the threat gives rise to no inference of discrimination, as Vasquez allegedly stated he was going to fire the employees for supporting another union, not because they were Mexican. The fact that he uttered his derogatory references to Mexicans only four days later does support such an inference, but like those comments themselves, the inference is far too remote from the challenged decision, which concerns Local 10's strategy for pursuing Plaintiffs' grievances. Furthermore, Plaintiffs' allegations of collusion are, as noted, unsupported in that Plaintiffs have not demonstrated that Vasquez was in a position to fire them or to influence Edsal to do so.

### 2. Disparate Treatment

As explained earlier, Plaintiffs' allegations of disparate treatment rely entirely on Trevino's deposition testimony, in which Trevino—who is not a party to this suit—related (1) general observations of favoritism shown by Edsal towards unidentified black workers, and (2) specific instances in which Local 10 officials did not act on his complaints. The former include allegations

that he saw black workers taking naps without being reprimanded, observed a black worker receiving an easier work assignment than another (unidentified) pregnant employee, and overheard a black supervisor refer to "fucking Mexicans."  Regardless of admissibility issues, none of this testimony, which relates to *Edsal's* alleged favoritism and/or discrimination, is relevant to Plaintiffs' assertion that *Local 10* treated its native-born members more favorably than its Mexican members. Trevino did not testify that he informed any Local 10 official of these incidents; and although he testified that he told CSJB President Spano that there was generally discrimination against Hispanics at Edsal, that fact alone does not establish that Local 10 favored native-born members or discriminated against its Mexican members.  *See Pipefitters*, 334 F.3d at 660-61(Title VII imposes no general duty on unions to prevent discrimination in the workplace).

Trevino also described specific instances in which he complained to Local 10 about various workplace issues, but where Local 10 allegedly failed to adequately respond.  Some of these provide no support for Plaintiffs' position.  For instance, Trevino asserted that he once complained to a Local 10 steward that a foreman reprimanded him, but not black workers, for taking too long in the bathroom; he acknowledged, however, that this ended after he complained.  He alleged that Rios failed to respond when he complained after being issued warnings; because this happened in 2005, however, it is not relevant to events here.  Other incidents appear more relevant: Trevino asserted that he once complained to CSJB President Spano after a supervisor ordered him to do work that he thought was the responsibility of a black female machine operator, that Spano promised to have Rios investigate, and that Rios did not; and that he once tried to file a grievance on behalf of a co-worker, but that Horacio Vasquez refused the grievance on grounds that Trevino was not actually a steward and then called him a "fucking Mexican."

Trevino's allegations that Local 10 was hostile to his complaints might support Plaintiffs' assertions of disparate treatment, if Plaintiffs also presented evidence that native-born members' complaints were more favorably received.  *See Johnson*, 826 F.2d at 542 (to show union's racial

animus through disparate treatment, plaintiff required "to show at least some evidence that the grievances of similarly situated white employees were treated differently than was his grievance"). Significantly, Plaintiffs fail to do so. Aside from James, Plaintiffs do not identify a single, non-Mexican union member that Local 10 allegedly favored; and there is no evidence, as noted, to support Plaintiffs' assertion that Local 10 condoned James' solicitation activities or favored him in any complaint or grievance proceeding. Without any showing that Local 10 was more receptive to complaints from native-born members, or gave preferential treatment in any way to those members, Plaintiffs present only half of the disparate treatment equation. Accordingly, Plaintiffs' attempt to show Local 10's discriminatory animus through disparate treatment fails.[38] *See, e.g., id.* at 542-43 (affirming district court's conclusion that black plaintiff, terminated for intoxication, failed to show union's racial animus in refusing to file grievance by identifying eight white employees for whom the union brought grievances, but who had engaged in dissimilar misconduct; and where five white workers had engaged in misconduct, but union was unaware and had not acted on their behalf); *Porter v. Rohan*, No. 01 C 6992, 2003 WL 548396, at * 13 (N.D. Ill. Feb. 25, 2003) (plaintiff failed to show union's racial animus in refusing to file grievance where plaintiff identified two white members, but the union had not filed a grievance for either one); *Catley v. Graphic Communications Int'l Union, Local 277-M*, 982 F. Supp. 1332, 1343 (E.D. Wis. 1997) (female plaintiff failed to show disparate treatment where she made four complaints about sex harassment to union officials, but presented no evidence that union responded more favorably to male members).[39]

--------

[38]     As noted, the stricken affidavits of Trapaga and several other employees, like Trevino's deposition testimony, relate incidents in which Edsal allegedly showed favoritism towards black employees, and/or Local 10 either did not act on complaints of such favoritism or refused to file grievances when Hispanic members complained about black members. Absent from these affidavits are any assertions that Local 10 responded more favorably to complaints from native-born members.

[39]     The court further notes that if Plaintiffs could demonstrate that Local 10 had decided "as a matter of policy not to grieve complaints of discrimination" by its Mexican or Hispanic workers,
(continued...)

55

### 3. Failure to Present National Origin Evidence

Plaintiffs contend that Local 10's decision not to present evidence of national origin disparate treatment by Edsal at Plaintiffs' arbitration hearing, is itself evidence that Local 10 harbored national origin animus. The court is not persuaded. As discussed, that decision did not constitute a breach of Local 10's duty of fair representation on grounds that it was arbitrary or irrational, nor does the evidence show it to have been in bad faith. Plaintiffs have further failed to explain how, standing alone, the decision not to introduce such evidence gives rise to an inference of discriminatory motive.

Plaintiffs argue that Local 10's actions throughout the grievance process constituted an attempt merely to "recover from the mess caused by Horacio Vasquez." (Pl.'s Resp., at 6.) According to Plaintiffs, Local 10 simply "put on a good face and walk[ed] through the motions." (*Id.* at 7.) Plaintiffs do not explain how the record supports this characterization. Local 10 demanded arbitration two weeks after Edsal discharged Plaintiffs and Trevino on May 29, 2003, and hired Ward to represent the grievants throughout the process. Ward and Rios negotiated a settlement on August 15 that would have reinstated the employees with full benefits and seniority, which they rejected apparently because they would not also receive back pay. (Def.'s 56.1 ¶¶ 35-39.) At the hearing itself, Ward, according to Arbitrator Smith, aggressively cross-examined Edsal's witnesses and objected to Edsal's evidence. (*Id.* ¶ 54; Arbitration Decision, at 15-16.) During Local 10's case in chief, Ward presented testimony from Plaintiffs, Trevino, and four employees, all of whom Ward had prepared for testimony. (Def.'s 56.1 ¶¶ 58-59.) Local 10 introduced fifteen exhibits into the record, as well as seventeen joint exhibits with Edsal, and later filed a written brief with Arbitrator

---

[39](...continued)
because Edsal's hostility to such complaints would make it harder for Local 10 to deal with Edsal, then Plaintiffs' Title VII claim would likely have more merit. *See Pipefitters*, 334 F.3d at 661 (citing *Goodman v. Lukens Steel Co.*, 482 U.S. 656, 668-69 (1987)). The court does not understand Plaintiffs to so argue, however, and the evidence does demonstrate in any event that Local 10 had such a policy.

Smith that further argued Plaintiffs' case. (*Id.* ¶¶ 61-62, 69.)

Had Local 10 refused to demand arbitration after Plaintiffs' May 2003 discharges, then the inference of animus provided by Horacio Vasquez's then-recent derogatory comments might be an indication of discriminatory motivation on the part of Local 10. The fact that Local 10 pressed Plaintiffs' and Trevino's grievances, however, and negotiated a settlement on what appears to have been favorable terms, belies any suggestion of half-hearted efforts. That Local 10 continued on to full-blown arbitration after Plaintiffs rejected the settlement should erase any such inference. The court cannot glean from these efforts any indication that Ward and/or Local 10 were simply "going through the motions." The mere fact that Local 10 chose not to pursue a strategy of arguing disparate treatment based on national origin (an argument that would have shifted the burden of proof to the union) does not reveal Local 10's efforts on Plaintiffs' behalf to be a masquerade whose purpose was to conceal an animus towards Mexicans.

Moreover, it is not insignificant that Plaintiffs and Trevino told Arbitrator Smith at the conclusion of each day of the arbitration hearing that they were satisfied with their interpreter, the proceedings, and Local 10's representation, and further signed a stipulation that they had had a full and complete hearing and had "no further proof to offer." (Stipulation of January 9, 2004.) *See Taylor v. Belger Cartage Serv., Inc*, 762 F.2d 665, 668 (8th Cir. 1985) (affirming summary judgment on Title VII claim against union where plaintiff expressed satisfaction with representation he received, and union processed grievance through arbitration hearings at which plaintiff had opportunity to be heard). Plaintiffs' assertion that they signed the stipulation without knowing what it meant does not contradict what they told Smith, nor is the court persuaded that the phrase "no further proof to offer" is incomprehensible legalese.

The court concludes that Plaintiffs have not demonstrated that Local 10 breached its duty of fair representation by handling their grievances with discriminatory intent. The court therefore grants summary judgment in favor of Defendant on Plaintiffs' Title VII claims.

## IV.    Plaintiffs' § 1981 Claims

Plaintiffs also bring claims under § 1981.  It is well settled that "[t]he same standards governing liability under Title VII apply to § 1981 claims."  *Bennett*, 295 F.3d at 697 (citing *Gonzalez v. Ingersoll Milling Mach. Co.*, 133 F.3d 1025, 1035 (7th Cir. 1998)).  "The methods of proof and elements of the case are essentially identical."  *Johnson v. City of Fort Wayne, Ind.*, 91 F.3d 922, 940 (7th Cir. 1996).  Thus, as with their Title VII claims, Plaintiffs "must prove that [they were] the victim of intentional discrimination."  *Majeske v. Fraternal Order of Police*, *Local Lodge No. 7*, 94 F.3d 307, 312 (7th Cir. 1996).  As explained above, Plaintiffs have not shown that Local 10 intentionally discriminated against Plaintiffs on the basis of their national origin.  Defendants are thus entitled to summary judgment on Plaintiffs' § 1981 claims as well.

## CONCLUSION

For the above reasons, Defendant's motion for summary judgment (18) is granted. Defendant's motion to bar late filed pleadings (52) is denied.  Defendant's motions to strike Plaintiffs' LR 56.1 statement (72) and affidavits (74) are granted in part and denied in part as discussed herein.

ENTER:

Dated:  March 30, 2007

REBECCA R. PALLMEYER
United States District Judge